UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STEVEN PALENCAR,

Plaintiff

-v-

NEW YORK POWER AUTHORITY; GIL
QUINONES; KRISTINE PIZZO; EDWARD
WELZ; PHILIP TOIA; WILLIAM SENIOR; RANI
POLLACK; and DIANA BODOLATO,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5:15-CV-857; 5:15-CV-1363; &
5:16-CV-200

APPEARANCES:

OF COUNSEL:

TULLY, RINCKEY LAW FIRM
Attorneys for Plaintiff
441 New Karner Road
Albany, NY 12205

ALLEN A. SHOIKHETBROD, ESQ.
ERICK D. KRAEMER, ESQ.

LAW OFFICES OF DAVID A. FALLON
Attorneys for Plaintiff
90 State Street Suite 700
Albany, NY 12207

DAVID A. FALLON, ESQ.

KELLY LAW CENTER P.C.
Attorneys for Plaintiff
2717 Bellevue Avenue Suite 6
Syracuse, NY 13219

DONALD E. KELLY, ESQ.

BOND, SCHOENECK & KING, PLLC
Attorneys for Defendants
One Lincoln Center
Syracuse, NY 13202

JONATHAN B. FELLOWS, ESQ
LIZA R. MAGLEY, ESQ.

BOND, SCHOENECK & KING, PLLC-NYC
Attorneys for Defendants
600 Third Avenue, 22nd Floor
New York, NY 10016

LOUIS P. DILORENZO, ESQ.

NEW YORK POWER AUTHORITY
Attorneys for Defendants
123 Main Street
White Plains, NY 10601

MICHAEL P. MCCARTHY, ESQ.

DAVID N. HURD
United States District Judge

# MEMORANDUM–DECISION and ORDER

## Table of Contents

I.    INTRODUCTION ................................................................................................................. 3

II.   BACKGROUND .................................................................................................................. 4

  A.   PALENCAR'S EARLY NYPA CAREER AND FIRST LAWSUIT. ........................................ 4

  B.   NYPA CHANGES PALENCAR'S RESPONSIBILITIES. ..................................................... 7

  C.   THE PESH COMPLAINT AND PALENCAR'S OBJECTIONS TO HIS ROLE....................... 8

  D.   PALENCAR'S APPLICATION FOR TRANSMISSION SUPERINTENDENT. ..................... 10

  E.   PALENCAR'S CHALLENGE TO HIS FLSA EXEMPT STATUS. ....................................... 11

  F.   THE COUNSELING SESSION AND LETTER. ................................................................ 12

  G.   PALENCAR'S 2014 RATING OF "PARTIALLY ACHIEVES EXPECTATIONS." ................. 13

  H.   PALENCAR FINDS SENIOR'S JOURNAL. ................................................................... 14

  I.   THE LINE CREW TAMPERS WITH THE MEETING ROOM STOVE................................ 16

  J.   THE LINE CREW'S MOUNTING FRUSTRATIONS WITH PALENCAR. .......................... 17

  K.   NYPA'S INVESTIGATION OF PALENCAR. .................................................................. 19

  L.   PALENCAR'S RESISTANCE TO PAYING AN EMPLOYEE PER DIEM............................. 22

  M.    PALENCER'S FINAL WARNING AND PLACEMENT ON LEAVE. ................................. 24

  N.   THE DECISION TO TERMINATE PALENCAR. ............................................................. 25

  O.   PROCEDURAL HISTORY. .......................................................................................... 26

III.  LEGAL STANDARD.......................................................................................................... 26

IV.   RETALIATION ................................................................................................................. 27

  A.   LEGAL STANDARD FOR RETALIATION. ..................................................................... 27

  B.   DISCUSSION. ........................................................................................................... 29

    1.   PALENCAR'S LOSS OF PER DIEM .......................................................................... 30

    2.   LACK OF RESPONSE REGARDING PALENCAR'S FLSA EXEMPT STATUS. ................ 30

    3.   NOT CONSIDERING PALENCAR FOR TRANSMISSION SUPERINTENDENT. ............. 31

    4.   THE SEPTEMBER 26, 2014 LETTER......................................................................... 32

    5.   THE COUNSELING LETTER...................................................................................... 33

    6.   PALENCAR'S LOSS OF DUTIES. .............................................................................. 33

    7.   PALENCAR'S 2014 PPR........................................................................................... 34

    8.   SENIOR'S JOURNAL................................................................................................ 37

    9.   THE STOVE-TAMPERING INCIDENT. ...................................................................... 38

10. THE WARNING LETTER. ...................................................................................................................... 39

11. PLACEMENT ON PAID ADMINISTRATIVE LEAVE. ............................................................................ 42

12. THE NYPA INVESTIGATION. ............................................................................................................ 43

13. PALENCAR'S TERMINATION. ........................................................................................................... 47

14. UPHOLDING PALENCAR'S TERMINATION. ....................................................................................... 51

15. SUMMARY OF PALENCAR'S AGGREGATED CLAIMS. ...................................................................... 52

V.   SECTION 740 RETALIATION ................................................................................................................... 52

VI.  DISCRIMINATION .................................................................................................................................. 53

A.   LEGAL STANDARD FOR DISCRIMINATION. .......................................................................................... 54

B.   DISCUSSION. ........................................................................................................................................ 55

VII. CONCLUSION ........................................................................................................................................ 59

I.   **INTRODUCTION**

Plaintiff Steven Palencar ("Palencar" or "plaintiff"), filed a state law discrimination claim against his employer, New York Power Authority ("NYPA" or "the company") in 2008.  Plaintiff settled that claim in 2010 and continued working for the company until 2015.  On July 13, 2015, he filed the first of his three present complaints, 5:15-CV-857, alleging that the company retaliated against him for his initial suit and varied other complaints he had lodged against it.  Plaintiff based this claim on 42 U.S.C. § 2000e-3(a) of Title VII ("Title VII retaliation"), 29 U.S.C. § 215(a)(3) of the Fair Labor Standards Act ("FLSA retaliation"), N.Y. EXEC. LAW § 296(e) ("NYSHRL retaliation"), and N.Y. LAB. LAW § 740.2(a) ("§ 740").

On November 17, 2015, Palencar filed a second complaint, 5:15-CV-1363, alleging additional retaliatory acts by the company, as well as discrimination against him because he identifies as a gay man.  The second complaint relied on Title VII retaliation, 42 U.S.C. § 2000e-2(a) ("Title VII discrimination"), NYSHRL retaliation, and N.Y. EXEC. LAW § 296(b) ("NYSHRL discrimination").

On February 22, 2016, Palencar filed a third complaint, 5:16-CV-200, alleging that NYPA had again discriminated and retaliated against him by ending his employment.  For this

complaint, he relied on Title VII and NYSHRL for both his retaliation and discrimination claims. Plaintiff amended this third complaint on October 20, 2016, to include allegations of retaliation and discrimination under NYSHRL against: Gil Quinones ("Quinones"), President and CEO of NYPA; Kristine Pizzo ("Pizzo"), Senior Vice President of Human Resources for NYPA; Edward Welz ("Welz"), COO of NYPA; Philip Toia ("Toia"), Vice President of Transmission, and plaintiff's highest direct supervisor; William Senior ("Senior"), plaintiff's immediate supervisor; Rani Pollack ("Pollack"), NYPA's director of Human Resources and Employee Relations; and Diana Bodolato ("Bodolato"), a NYPA employee relations specialist.

On March 15, 2016, Palencar's three complaints were consolidated into one action ("the action"). On February 14, 2019, all defendants moved for summary judgment under Federal Rule of Civil Procedure ("Rule") 56.

## II.    BACKGROUND

### A.    PALENCAR'S EARLY NYPA CAREER AND FIRST LAWSUIT.

NYPA is a power company that generates and transmits electricity. Dkt. 105-2 ("Toia Dec."), ¶ 5. The employees responsible for maintaining the power lines and towers are called linemen, and are organized into groups called line crews. *Id.* ¶¶ 7, 10. The company hired Palencar as a lineman in 1999. *Id.* ¶ 33. Between 1999 and 2008, plaintiff received several promotions for his technical skill. *Id.* ¶ 34.

On September 12, 2008, Palencar, a gay man, filed a lawsuit alleging that NYPA discriminated against him because of his sexual orientation. Toia Dec. ¶ 35. Plaintiff alleged that the other members of his line crew, particularly Scott Wiggins ("Wiggins"), Bill Baldwin, and his supervisor Andy Cline ("Cline"), discriminated against him through offensive

language, vulgar pranks, and other hostile expressions against homosexuals. *See generally*, Dkt. 114-2, pp. 7-14.[1]

For example, in one incident on December 3, 2010, Wiggins used a discriminatory slur in referring to Palencar in front of a contractor and suggested that the contractor engage in a sex act with plaintiff. Dkt. 114-7, pp. 1-2. For these remarks, he received a written reprimand, which was later reduced to a verbal warning. *Id.*; Dkt. 114-8.

On December 31, 2010, plaintiff agreed to settle his original complaint. Toia Dec. ¶ 35. During the pendency of that lawsuit, Palencar was promoted to Transmission Supervisor at NYPA's Frederick R. Clark Energy Center ("CEC") on July 10, 2010.[2] Toia Dec. ¶ 36. As Transmission Supervisor, plaintiff reported directly to Cline. *Id.* ¶ 37. The dynamic began smoothly, as reflected in plaintiff's first Performance Plus Report ("PPR"), a year-end performance review, issued in December of 2011. Dkt. 105-4. Plaintiff received marks of "achieves expectations" across every category measured by the PPR, except for receiving "exceeds expectations" marks for delegating responsibilities to his subordinates and holding them accountable. *Id.* at 12. The only comments that indicated potential issues were that Cline told plaintiff that "[b]etter attendance at meetings . . . is encouraged for 2012, which should help cultivate better communication between the various departments at CEC." *Id.* at 13.

In 2012, Palencar's PPR was slightly less positive, however. He received marks of "partially achieves expectations" in two categories, one for encouraging open communication, and another for fostering a sense of teamwork. Dkt. 105-5, p. 12. The report noted that plaintiff "needs to focus on developing his communication skills in 2013," which he could

---

[1] Pagination corresponds with CM/ECF.
[2] In NYPA, a Transmission Supervisor oversees an entire line crew, although CEC had two Transmission Supervisors for its single line crew. Toia Dec. ¶¶ 16-18.

5

improve "through attendance at NYPA's Professional Development training." *Id.* at 13. Cline also identified "dealing with difficult people" and "building trust and fostering a sense of teamwork" as areas that needed improvement. *Id.* To address these deficiencies, he recommended that plaintiff attend continuing education and public speaking classes. *Id.* at 14.

Palencar's 2013 PPR showed improvements in his categorical evaluation, however, Cline's summary maintained that his same interpersonal deficiencies carried over from the previous year. Dkt. 105-13, pp. 11-12. The summary provides that although "plaintiff attended a number of internal personal development courses offered at CEC, more work will be necessary in 2014 and beyond to facilitate his development as an effective leader." *Id.* at 12. The summary noted that plaintiff "will need to be more open to the value of the content of future development courses, focusing on changes to his communication and supervisory style. He continues to struggle with interactions with the crews and his peers . . . ." *Id.* Again, the PPR recommended that plaintiff attend continuing education and public speaking classes. *Id.* at 14.

This year, however, Palencar strenuously objected to his PPR, particularly the language regarding his interpersonal interactions. Dkt. 105-13, pp. 12-13. He objected that the review was different from the one that he and Cline had discussed. *Id.* Moreover, plaintiff declared that he "dispute[d] these comments and f[ou]nd them to be an offensive, malicious and deliberate perpetuation of falsehoods that are in no way based on reality." *Id.* at 13. Cline, for his part, noted that the only change to plaintiff's 2013 PPR from what he discussed with plaintiff was the optional reflection on plaintiff's development needs. Dkt. 105-20, p. 2.

On January 30, 2014, the local chapter of the International Brotherhood of Electrical Workers ("the union"), wrote a letter to defendant Toia, Palencar's highest direct supervisor,

to raise concerns as to plaintiff's conduct.  Dkt. 105-16, p. 2.  In that letter, the union decried plaintiff's "openly confrontational style of micromanaging [that] includes tactics of intimidation and harassment."  *Id.*  The letter goes on to describe plaintiff's "attitude of condescension and arrogance," his "shocking lack of respect for fellow managers and engineers," and attributes to plaintiff a general "environment of distraction and diminished morale[.]"  *Id.*  The letter further describes plaintiff as displaying "behavior that seem[s] intended as nothing more than impetuous abuse of power."  *Id.*  The union concluded by expressing a hope that "NYPA will take swift action to alleviate the hostile environment" that it attributed to plaintiff.  *Id.* at 3.

## B. NYPA CHANGES PALENCAR'S RESPONSIBILITIES.

Beginning on March 3, 2014—two months after NYPA received the union's January 30 letter—the company underwent organizational changes, which altered Palencar's role.  Dkt. 105-18, p. 2.  Particularly, he and defendant Senior, his co-Transmission Supervisor, saw their responsibilities redistributed.  *Id.*  Senior would determine the line crew's work locations and coordinate with other supervisors for global projects.  *Id.*  Plaintiff, by contrast, was tasked with providing technical support and consultation, reviewing completed work orders, sending Per Diem payment requests as necessary, and visiting the line crew "in the field from time-to-time, or as requested, to provide technical support . . . without providing direction or oversight of the work."  *Id.*  Cline noted to plaintiff that his "technical expertise is a real asset to NYPA and this role."  Dkt. 105-19.

On February 20, 2014, Palencar asked to meet with Toia because he was "very unhappy about [his] new role . . . ."  Dkt. 105-21, p. 2.  On February 21, 2014, plaintiff complained that his 2013 PPR, in conjunction with the role change, constituted a "cowardly attack" and discrimination.  Dkt. 105-20, p. 2.  Moreover, plaintiff insisted that he would not change "who [he is], [his] lifestyle[,] or anything else about [him]self to conform to [NYPA's]

definition of normal." *Id.* Cline expressed concern that plaintiff was attempting to "portray himself as a victim . . . ." *Id.* He was especially concerned about plaintiff's accusatory language, despite his belief that he had attempted to help plaintiff develop and had "given him the benefit of the doubt on many, many occasions[.]" *Id.*

### C. THE PESH COMPLAINT AND PALENCAR'S OBJECTIONS TO HIS ROLE.

Nevertheless, Palencar continued in his new role in NYPA. On March 28, 2014, that new role found its first roadblock. Dkt. 114-28. In some circumstances, line crews need to disable power lines to properly repair them. Toia Dec. ¶ 10 n.2. In these circumstances, a supervisor will "hold clearance," or oversee a de-powered area of the line. *Id.* NYPA's protocol for holding clearance is CPP-1, which requires that the supervisor who holds the clearance direct and supervise the work conducted in the area without power. Dkt. 114-28, pp. 1-2. Because plaintiff had been prohibited from overseeing the crew, he objected that the "nonsensical restrictions" of his role meant he could not safely hold clearances. *Id.* at 1, 3.

In objecting to the roles and responsibilities as they related to his ability to hold clearances, Palencar noted that "there has been no change in the innate characteristics that make me who I am" and that "the onus is on NYPA to help make the crew/[u]nion/co-workers more accepting and less hostile and retaliatory" to him. Dkt. 114-28, p. 3. On May 20, 2014, New York State's Public Employee Safety and Health Bureau ("PESH") conducted an inspection of NYPA's policies concerning holding clearances. Dkt. 105-25, p. 2. On August 27, 2014, PESH issued a citation because "[t]he CEC TM Supervisor Roles and Responsibilities . . . do not make it clear that the employee who is holding a clearance is in charge of the clearance as required by" regulation. *Id.* at 4. Subsequently, on September 12, 2014, plaintiff's role included the responsibility to hold clearances in compliance with CPP-1. Dkt. 105-26, p. 3.

8

This was not, however, the end of Palencar's objections to his new role.  In September of 2014, he asked Toia and Cline for a meeting because he was concerned that the line crew was in a "death spiral," which was "caused by the nonsensical new 'roles and responsibilities'" directive.  Dkt. 105-27, p. 2.  His supervisors expanded that meeting to include a "reaffirmation of roles and responsibilities."  *Id.*

The meeting took place on September 12, 2014, the same day Palencar's responsibilities were clarified to comply with CPP-1.  *See* Dkt. 105-28, p. 2.  During the resulting meeting with Cline and Toia, Senior agreed that he would follow and understood his newly clarified responsibilities.  *Id.*  Plaintiff said that he understood his role, but that he disagreed with it.  *Id.*  He further said that he would not follow the role guidelines after he completed the clearance he was currently working on.  *Id.*  Instead, he stated that he "will be taking back over the roles and responsibilities of the day to day operations."  *Id.*  That concluded the roles and responsibilities section of the meeting.  *Id.*  Senior then left so that Toia and Cline could address plaintiff's other concerns.  *Id.* at pp. 2-3.

Palencar announced that he had filed a complaint with PESH that triggered the inspection.  Dkt. 105-28, p. 3.  He also provided Cline and Toia with photographs of varied safety violations and mistakes by his line crew.  *Id.*  When Cline asked whether he had instructed the crews to fix those mistakes and violations, plaintiff said that he had not, because the crew "should know how to do it."  *Id.*  He also objected to a lack of pride among the workers.  *Id.*  When Cline asked him what he did to instill pride in the line crew before the roles and responsibilities change, plaintiff replied that he "could not fix what had been wrong for 15 years . . . ."  *Id.*  Plaintiff laid the blame partially at Cline and Toia's feet for creating the culture and noted that "history will prove [him] right."  *Id.*  Plaintiff disputes the accuracy of the notes concerning this meeting.  Dkt. 114-1 ("Palencar Dec."), ¶ 29.  After the meeting, plaintiff

sent an email to several other NYPA employees acknowledging that he had reported the company to PESH, which resulted in the citation.  Dkt. 105-29, p. 2.

A few days after that meeting, Toia affirms that Palencar approached him in his office, closed the door, and stood between him and the door so as to prevent him from leaving.  Toia Dec. ¶ 100.  Plaintiff admits that he met with him but denies blocking the door.  Palencar Dec. ¶ 31.

On September 26, 2014, Toia sent Palencar a letter memorializing the September 12 meeting.  Dkt. 105-30, p. 2.  In that letter, he told plaintiff that his admission that he would take pictures of safety violations, but not correct them was "unacceptable and w[ould] not be tolerated in the future."  *Id.*  Instead, he told plaintiff that he needed to report any violations so that NYPA could undertake corrective action to "protect [its] employees."  *Id.*  He also reminded plaintiff that plaintiff's "support on technical issues . . . serves as a great learning or training tool to [company] employees to ensure these types of mistakes are not repeated."  *Id.*

In closing the letter, Toia noted that he perceived Palencar's "tone and conduct" during the meeting "to be hostile and unprofessional."  Dkt. 105-30, p. 3.  He noted that he "will not tolerate insubordination from anyone in the workplace" and that he expects that plaintiff will comport himself "in the workplace in a professional manner . . . ."  *Id.*  Nevertheless, he forwarded plaintiff's discrimination concerns to NYPA's Affirmative Action Officer.  *Id.*

### D.  PALENCAR'S APPLICATION FOR TRANSMISSION SUPERINTENDENT.

Approximately one week later, Palencar applied for the position of Transmission Superintendent, a newly created role that would be filled after Cline's retirement on December 31, 2014.  Toia Dec. ¶ 101.  One of the requirements for the position was possession of a bachelor's degree.  Dkt. 105-31, p. 4.  Plaintiff does not have a bachelor's degree.  Dkt. 105-32, p. 2.  Of the applicants for the Transmission Superintendent position,

only plaintiff and one other candidate did not possess the required degree.  *Id.*  Both were the only two applicants not listed as having the minimum qualifications for the position.  *Id.*

Palencar was told that he did not meet the qualifications requirements for the position of Transmission Superintendent and did not receive an interview.  Dkt. 107-14, p. 45.  On October 29, 2014, plaintiff objected to this determination, and wrote to the CEC Human Resources Manager, claiming that "in [his] opinion none of [NYPA's] current employees have all of the required experience" listed for the position.  Dkt. 105-33, p. 2.

Palencar thus argued that Toia was using his lack of a bachelor's degree to target and disqualify him while "ignoring the huge and obvious short[]comings of other candidates that do not meet the other qualifications . . . ."  Dkt. 105-33, p. 2.  He then stated that he would report "this negative employment action" to the Equal Employment Opportunities Commission ("EEOC").  *Id.*  In the end, NYPA offered the position to Senior, who possessed a bachelor's degree.  Toia Dec. ¶ 109; Dkt. 105-32, p. 2.  Plaintiff contends that Senior also lacked the minimum qualifications for the position because he had never worked as a member of the line crew and lacked the requisite technical expertise.  Palencar Dec. ¶ 36.

### E.  **PALENCAR'S CHALLENGE TO HIS FLSA EXEMPT STATUS.**

On October 22, 2014, Cline emailed every Transmission Supervisor informing them that as a result of an audit, NYPA would no longer pay the Transmission Supervisors for travel in the form of a per diem.  Dkt. 105-34, p. 2.  Instead, it would reimburse them for their expenses.  *Id.*  Additionally, the email noted that Transmission Supervisors could no longer claim overtime pay for their travel to and from work sites.  *Id.*; *see* Dkt. 105-37, p. 3.

On October 24, 2014, Palencar asked Cline whether he was considered a non-exempt employee under the Fair Labor Standards Act ("FLSA"), such that he would be entitled to overtime pay.  Dkt. 114-49.  Plaintiff took the position that he is not exempt, and asserted that

if he did not receive an answer by October 31, 2014 or "[i]f NYPA disagree[d] with [his] interpretation of . . . FLSA and continue[d] to consider [him] an Exempt employee, [he would] look into filing a complaint" under FLSA.  *Id.*

### F.  THE COUNSELING SESSION AND LETTER.

On October 31, 2014, Toia and Cline had another meeting with Palencar, which they styled a "counseling session."  Dkt. 105-38, p. 2.  The counseling session addressed plaintiff's communication skills.  Dkt. 105-36, p. 2.  According to the meeting notes, plaintiff stated that he should not be evaluated on his communication skills anyway, to which Cline replied that communication is an important part of his job.  Dkt. 105-36, p. 2.  As part of the meeting, they handed plaintiff a "Counseling Letter" to clarify his FLSA exempt status and to generally address reported frictions between him and NYPA.  *Id.*; Dkt. 105-37, p. 2.  The letter provided several reasons for plaintiff's non-exempt status, including his independent use of judgment in affording technical advice to the line crew.[3]  *Id.*

However, the Counseling Letter also reiterated that Palencar had problems communicating with his coworkers.  Dkt. 105-37, p. 3.  Toia offered to "coordinate a meeting between [plaintiff] and Talent Development to review available classes on how to effectively communicate in the workplace[.]"  *Id.*  He further noted that he "remains open and available to discuss workplace issues with [plaintiff], but [he] will no longer tolerate [plaintiff's] conduct which can best be described as inappropriate, and on occasion, threatening."  *Id.*

Toia then listed four examples of inappropriate and threatening behavior:  (1) Palencar's saying "[y]ou have not heard the end of this" to supervisors at the termination of the per diem policy; (2) responding sarcastically to a work directive from Cline and calling it "blatant retaliatory action;" (3) insisting that internal training classes were a waste of time; and

---

[3] Plaintiff has since acknowledged that he was automatically exempt from FLSA because his salary exceeded $100,000.  Dkt. 107-14, pp. 42-43.

(4) declaring that he did not need to develop or change, instead, everyone else needed to change their perception.  Dkt. 105-37, pp. 3-4.  The Counseling Letter closed with an admonition that "[a]ll employees, including [plaintiff], are expected to conduct themselves professionally, treat co-workers with respect[,] and follow company policies and procedures." *Id.* at 4.

That same day, Palencar responded with an email that he sent to the attendees of the meeting, NYPA's Affirmative Action Officer, and defendant Pollack, NYPA's Director of Human Resources.  Dkt. 105-38, p. 2.  In that email, plaintiff asserted that the letter was misleading, and that it wrongfully portrayed his opposition to discriminatory and retaliatory conduct as inappropriate and threatening.  *Id.*  Plaintiff further stated that the letter itself was "retaliatory," and possibly constituted "an illegal employment action."  *Id.*  Lastly, he noted that he reported the issuance of the Counseling Letter to the EEOC.  *Id.*

## G. **PALENCAR'S 2014 RATING OF "PARTIALLY ACHIEVES EXPECTATIONS."**

Given the growing friction between himself and NYPA, it is unsurprising that Palencar's 2014 PPR took a significant downward turn.  Dkt. 105-40.  Plaintiff received scores of "partially achieves expectations" in five categories, and the summary returned to familiar territory.  *Id.* at 11.  In it, Cline noted that plaintiff's "consistent weakness lies in his inability to effectively and productively communicate in the workplace," but that plaintiff "put little effort" into the PPR process and in identifying areas of improvement.  *Id.* at 12.

Further, the PPR indicates that "when given guidance or direction about his developmental needs, [Palencar] made inappropriate comments and came across in an unprofessional and obstinate manner.  His behavior often crossed the line into insubordination."  Dkt. 105-40, p. 12.  Specifically, the PPR noted that plaintiff would observe and document safety issues without taking corrective action, failed to provide management

with timely updates on issues, did not work productively with the Line Crew, and did not carry out his responsibility for providing technical guidance. *Id.*

Cline had worked extensively with the company's legal department to edit Palencar's PPR. *See generally* Dkt. 114-21. In particular, the legal department suggested that he "provide additional detail and examples" to support the PPR. *Id.* at 22. Cline defended the first two paragraphs against the legal department's criticisms by noting that they do not "describe a model employee" but instead "merely point out that [plaintiff] had modest accomplishments[.]" *Id.* at 7. These accomplishments prevented plaintiff from receiving a score of "Did Not Meet Expectations." *Id.* However, Cline felt that the rest of the PPR "clearly describe[d] his ongoing shortcomings." *Id.*

### H. PALENCAR FINDS SENIOR'S JOURNAL.

On January 16, 2015, Palencar found a journal on an unused meeting desk. Dkt. 114-32, p. 2. That journal appeared to be new and similar to other journals given to the line crew. *Id.* Plaintiff flipped through its pages to determine who owned it, and in the process read some of its contents. *Id.* He wrote in an email to the NYPA employee investigating his retaliation claims that it contained "page after page" of efforts to "keep[] track of everything [plaintiff] did or said and twist[] it in the most unflattering fashion." *Id.*

The journal in fact belonged to Senior, and Palencar confronted him about its contents on January 19, 2015. Dkt. 114-32. Plaintiff's email elaborated that he then told plaintiff that he had been directed to document everything plaintiff said or did in the journal. *Id.* In that same email, plaintiff asserted that "[i]n [his] opinion, this increased scrutiny is sufficient to establish the element of a prima facie case of a retaliatory action." *Id.* Toia denies that NYPA management ever told Senior to keep the journal of plaintiff's actions. Toia Dec. ¶ 138.

The journal did include several references to Palencar. *See generally*, Dkt. 106-6. On January 5, 2015, Senior noted in the journal that he met with plaintiff to discuss plaintiff's 2014 PPR results. *Id.* at 9. "The meeting was cordial," but not productive. *Id.* He told plaintiff he can help him succeed, but plaintiff did not seem interested. *Id.* On January 8, he noted that there is friction between plaintiff and the line crew. *Id.* at 10. On January 9, he wrote that plaintiff disliked his decision to purchase speed wrenches for the line crew and recounted an interaction between himself and plaintiff where plaintiff was "condescending." *Id.*

On January 12, Senior wrote that he told Palencar he "did [an] excellent job" during a safety meeting. *Id.* at 11. That same day, he wrote of plaintiff's "very aggressive tone" in a meeting with Senior and Toia. *Id.* On January 13, he wrote positively of plaintiff's cooperation with the new Transmission Supervisor, and on January 19, he again wrote that he had complimented plaintiff's leadership of the safety meeting. *Id.* at 11-12.

On January 23, 2015, Palencar and the line crew argued about proper procedure for safely grounding the lines. Dkt. 106-6, p. 13. Senior wrote in his journal that plaintiff took the lead and made valid points. *Id.* Despite this, the conversation ended with disagreement, but he described the interaction as "healthy." *Id.*

On January 26, 2015, Senior noted in his journal that he reviewed Palencar's ongoing grievances against NYPA and offered to mediate. Dkt. 106-6, p. 13. Plaintiff demonstrated "no interest," and insisted that he would not be "weak." *Id.* Senior told plaintiff he only needed to be flexible, but the journal ended with the sentiment that such flexibility "won't happen." *Id.*

## I. THE LINE CREW TAMPERS WITH THE MEETING ROOM STOVE.

During his tenure as Transmission Supervisor, Palencar had a habit during morning meetings of placing paperwork that he intended to go over with the line crew on a stove in the crew room. Dkt. 105-42, p. 2. In February of 2015, Plaintiff entered the crew room at the CEC for a morning meeting, as he usually did. *Id.* On that particular day, however, an Employee Assistance Program ("EAP") pamphlet sat in the center of the stove. *Id.* Plaintiff moved the pamphlet out of the way and proceeded with the meeting normally. *Id.*

The next day, however, the pamphlet again sat in the center of the stove. Dkt. 105-42, p. 2. Indeed, every day for the remainder of the month of February, until March 2, 2015, Palencar found the EAP pamphlet on the stove. *Id.* Plaintiff believed that the pamphlet was an insult directed at him by the line crew, implying that plaintiff needed "some sort of mental help." *Id.*

Either two weeks after the pamphlet first appeared, or around the time the pamphlet stopped appearing, the light bulbs above the stove were also loosened, preventing them from lighting. *Compare* Dkt. 105-42, p. 2 (alleging that he bulbs were loosened about two weeks after the pamphlet started to appear), *with* Dkt. 105-43, p. 6 (alleging that the lightbulb loosening occurred on March 2 and 3, 2015). Palencar alleges that the lightbulbs were loosened "on multiple days." Dkt. 105-42, p. 2.

Finally, on March 4, 2015, when plaintiff attempted to light his customary burner to warm his lunch, the burner knob completely detached from the stove and fell to the ground. Dkt. 105-42, p. 2. Plaintiff repaired the knob himself and reported the incident to Senior. *Id.* Plaintiff asserts that if the unattached burner mechanism had touched the metal frame of the stove, it "could have caused a serious shock or even death" to anyone who happened to touch the stove. *Id.*

16

That same day, Palencar notified Senior concerning the varied incidents concerning the stove. Dkt. 106-17, p. 2. In response, Senior filed a letter the same day noting that the stove tampering was "uncalled for, childish, potentially unsafe" and that it needed "to be stopped." *Id.* If plaintiff brought a formal complaint, he stated he would "initiate a formal investigation." *Id.* He ended the letter by saying the conduct "either stops or it[ would be] addressed formally!" *Id.*

On March 11, 2015, Palencar sent an email to report the various incidents concerning the stove to NYPA. Dkt. 105-42, p. 2. Plaintiff's email did not constitute a formal complaint, but CEC security nevertheless investigated the incident. Dkt. 106 ("Senior Dec."), ¶ 128. On April 7, 2015, a company security officer interviewed plaintiff to investigate his varied complaints concerning the stove. Dkt. 105-43, p. 4. No other company employees were interviewed. Dkt. 106-26, p. 2. Because the security officer determined that the incidents had ceased, he recommended that no further action be taken. Dkt. 105-43, p. 3. On June 24, 2015, plaintiff sent another email to the members of the company that received his original complaint, claiming that the investigation into the stove incidents was insufficient and contrary to company policy. Dkt. 106-26, p. 2.

## J. THE LINE CREW'S MOUNTING FRUSTRATIONS WITH PALENCAR.

On January 29, 2015, a member of Palencar's line crew sent a letter to Senior declaring that the lineman was "absolutely furious" over plaintiff's behavior. Dkt. 106-11, p. 2. The lineman wrote that on that day, he, Wiggins, and other members of the crew left the woods where they had been cutting trees in "knee deep snow" at 2:20 p.m. *Id.* Plaintiff arrived at the work site, but "[a]s usual, he made no effort to exit his vehicle []or otherwise communicate with any member" of the crew. *Id.* The lineman states that the crew left the work site at 2:30 p.m. to "find a cup of coffee and a dry parking lot along the way [to the

17

NYPA staging area] to change out of [their] wet clothing." *Id.* Plaintiff then called Wiggins to state that the crew left the work site prematurely. *Id.*

The lineman objected to Palencar's "audacity" in "begrudg[ing] any human being [ten] minutes in a dry parking lot to change out of wet clothing during winter . . . ." Dkt. 106-11. The crewman noted that plaintiff "seems to delight in harassing particular crew members," especially Wiggins. *Id.* Moreover, the lineman states that plaintiff's "inappropriate history includes misconstruing facts, repeated attempts at intimidation, constant condescension and undeserved criticism." *Id.* The crewman alleges that as a result, three employees left the line crew, and four others interviewed for positions not supervised by plaintiff. *Id.* The crewman concludes by stating that plaintiff has "consistently demonstrate[d] that he cannot treat [the line crew] as a group of mature professionals." *Id.*

On February 2, 2015, the union sent NYPA a letter titled "Ongoing Harassment by Steven Palencar" ("crew letter"). Dkt. 114-20, pp. 2-4. The crew letter identified three incidents in which Palencar had acted inappropriately: (1) the incidents complained of in the January 29, 2015 letter; (2) on August 18, 2014, plaintiff claimed a lineman had improperly negotiated a road maintenance arrangement which NYPA later determined to be a distortion of the actual events; and (3) plaintiff denied Wiggins several days on his vacation request form because it exceeded the ten days allowed under the union contract, while granting another lineman thirteen days during the same period without question. *Id.* at 2. The crew letter noted that "[e]very Line Maintenance employee at CEC has expressed concern regarding [plaintiff's] manipulative temperament." *Id.*

The crew letter also decries "Palencar's openly confrontational style of micromanaging," his "approach of intimidation and harassment," and his "attitude of condescension and arrogance." Dkt. 114-20, p. 3. The union goes on to describe plaintiff's

"shocking lack of respect for fellow managers and engineers during project planning and safety meetings[.]" *Id.* The crew letter submits that plaintiff "has discovered a means of manipulating both corporate policies and external regulations to his benefit," and that NYPA's reluctance "to decisively address [plaintiff's] behavior . . . has created an atmosphere of genuine despair[.]" *Id.* The crew letter notes that morale had recovered during the year in which plaintiff's responsibilities were limited. *Id.* at 4. In closing, the crew letter notes that "[i]t is not without fear of [plaintiff's] vindictive and supremely calculated retaliation that [the line crew] registered this appeal." *Id.* Every member of the line crew signed the letter.[4] Dkt. 105-44, pp. 4-5.

On February 3, 2015, yet another member of the line crew complained to Senior about Palencar. Dkt. 106-13, p. 2. The line crew was not working outside, because a snowstorm "had reduced visibilities to approximately [one-quarter] mile." *Id.* Plaintiff noted that the temperature was eight degrees and stated that he "does not consider snow inclement" and directed the crew to begin to work. *Id.* For his part, plaintiff states that he left this decision up to Wiggins, and never pressured the line crew to work. Palencar Dec. ¶ 63.

## K. **NYPA'S INVESTIGATION OF PALENCAR.**

In response to the glut of complaints, but especially the crew letter, defendant Pollack, as Director of Human Resources and Employee Relations, began an investigation into Palencar's conduct. Dkt. 107 ("Pollack Dec."), ¶¶ 1, 6. On February 5, 2015, Pollack, defendant Bodolato, a NYPA Employee Relations Specialist, and several other members of the company's legal and human resource teams held a meeting to determine how to proceed with the investigation. Dkt. 114-16, pp. 78-83. At that meeting, one company employee

---

[4] Plaintiff notes that none of the individual defendants responsible for terminating him had seen the signature page until discovery. Dkt. 114-9, p. 6; 114-17, pp. 33-34; 114-18, p. 4; 114-19, p. 7. However, the NYPA employee who first received the signed letter had seen the signatures, presumably obscured them before forwarding them, and notified the other employees that every member had signed. Dkt. 114-20, p. 1.

thought the line crew seemed to be "blowing it out of proportion," and expressed a need to "talk to everyone."  *Id.* at 80.

Accordingly, as part of the investigation, Pollack and Bodolato interviewed twenty-five employees concerning Palencar, including members of his line crew and his supervisors. Pollack Dec. ¶ 7, Dkt. 107-3 ("Bodolato Dec."), ¶ 8.  The results of the interviews were unanimous:  plaintiff "put down the people he managed" and "refused to accept criticism [from his supervisors] and improve his communication skills[.]"  Bodolato Dec. ¶ 9.  He also "relentlessly question[ed] any directive he received."  *Id.*

Additionally, Pollack and Bodolato investigated Palencar's meal expense history. Bodolato Dec. ¶ 12.  The investigation determined that plaintiff violated the meal policy for purchasing two entrees and two side dishes on four occasions, purchasing a dinner with a receipt identifying two additional guests, which plaintiff stated was all food that he ate for himself, and on eight occasions purchasing candy in bulk, large bags of chips and soda in addition to lunch.  Dkt. 105-50, p. 6; 114-16, pp. 60-62.

On February 27, 2015, Senior had also confronted Palencar over one incident when he sought reimbursement after he bought an entire ham at a grocery store.  Dkt. 105-41, p. 2. Although Senior acknowledged that the meal policy is "very general," he nevertheless believed that plaintiff was violating the intent of the policy.  *Id.*  On March 2, 2015, Palencar responded to Senior by pointing out that grocery receipts were acceptable.  Dkt. 114-31, pp. 1-2.

Regarding Palencar's violations for buying snacks in addition to lunch, Lori Alesio, NYPA's Assistant General Counsel for Human Resources and Labor, stated that she had a "continuing concern" that the company was "applying a different standard to Palencar," because she thought that similar actions had not been flagged as a violation for other

employees.  Dkt. 114-16, pp. 16-17, 62 (comment LA7).  However, in direct response to Alesio's comment, an employee in the company's Accounts Payable department distinguished plaintiff's use of the policy to the examples Alesio identified, noting that the purchase of bulk items and multiple servings constituted a violation.  *Id.* at 62.  She additionally identified a previous employee's seeking reimbursement for items purchased from a drug store that had also constituted inappropriate use.  *Id.*

On April 23, 2015, Pollack and Bodolato reported the results of their investigation. Dkt. 114-16, p. 85.  The meeting notes convey that although Palencar is technically skilled, Senior and Toia felt that he needed to be disciplined.  *Id.*  On June 5, 2015, Pollack, Bodolato, and a third NYPA employee met concerning plaintiff.  Dkt. 114-19, p. 91.  The three employees determined that their next step would be to interview plaintiff and plan for the path forward, although they also noted that they "were in a good place" to terminate him.  *Id.* at 92.

During another meeting regarding Palencar on June 24, 2015, Toia expressed a concern about the line crew's complaints that he would only visit Wiggins' crew.  Dkt. 114-16, p. 93.  As a result, the company decided to review the GPS data of company vehicles plaintiff had used in the previous four months.  *Id.* at 95.  One employee at this time noted that she didn't "like the appearance of looking back [four] mo[nths]", and another pointed out that the company does not "track for anyone else."  *Id.*  Nevertheless, the company reviewed his GPS records, and found three violations of the vehicle policy:  two for unauthorized personal errands in a company vehicle and one for idling a vehicle for "almost an hour and a half" while shoveling his driveway.  Dkt. 105-50, pp. 7-8.

At the conclusion of the June 24 meeting, NYPA personnel determined they had "enough" to terminate Palencar.  Dkt. 114-16, p. 98.  This was especially true considering

that the line crew had complained of plaintiff's use of "hate speech."[5]  *Id.*  The meeting notes also reflect that plaintiff treated "everyone badly" and created a "bad environment" among the union, management, and his subordinates.  *Id.* at 96.  Nevertheless, Alesio noted that she thought it best for the decision to fire plaintiff to be "as strong" as possible.  *Id.* at 98.  Thus, the company determined that they needed "to get [plaintiff's] side of the story."  *Id.* at 93.

### L.  PALENCAR'S RESISTANCE TO PAYING AN EMPLOYEE PER DIEM.

On June 19, 2015, a NYPA employee requested two half days off work:  the morning on Monday for vacation and the afternoon on Tuesday for treatment at a hospital in Buffalo. Dkt. 105-46, p. 2; Senior Dec. ¶ 136; 106-23, p. 2; 114-16, p. 94.  The line crew was scheduled to work out of Rochester for the rest of the week starting Monday afternoon. Dkt. 106-23, p. 2.  Senior and the company's human resources department agreed that it made the most sense to have this employee travel to Rochester with the crew when he came in to work on Monday.  That way, he would be able to contribute to the crew while being closer to the hospital so that he needed less time to travel for treatment on Tuesday.  *Id.*  As such, the employee would be entitled to per diem payment for his time away in Rochester while he was working.  *Id.*

Palencar, however, scheduled the employee to remain at the CEC on Monday afternoon and Tuesday morning, and by that determination denied the employee a per diem payment.  Dkt. 107-14, pp. 32-34.  Plaintiff asserts that in so doing he was simply following protocol.  *Id.* at 33.  Because Senior thought it more appropriate in the circumstances to send the employee to Rochester, he overruled plaintiff's determination.  *See id.* at 38.  Human

---

[5] Plaintiff has listened to *Mein Kampf* on audiobook and emailed the audiobook to a contractor.  Dkt. 107-14, pp. 12, 55, 57.  Additionally, a member of his line crew stated on deposition that plaintiff "didn't like" that Jewish people were buried in a cemetery when the two of them drove past the cemetery together.  Dkt. 107-18, p. 10.

resources verified that it was not an issue if the employee traveled and was paid the per diem. *Id.* at 37-38.

Nevertheless, Palencar opposed this decision. Dkt. 106-23, p. 2. Plaintiff argued with both Senior and NYPA human resources for "numerous hours." *Id.* Finally, Senior "simply informed [plaintiff] . . . the decision was made." *Id.* Plaintiff, however, continued to argue with human resources. *Id.* During those arguments, he indicated that he expected the human resources employee to override Senior's decision. Dkt. 106-24, p. 2. Ultimately, plaintiff threatened to charge Senior and a human resources employee with ethics violations, although it is unclear whether he did so. Dkt. 106-23, p. 2; 106-24, p. 2.

Meanwhile, the union increasingly pressured NYPA to remove Palencar. Dkt. 106-23, p. 4. The union's chairman at CEC had emailed Pollack stating that the company would be "on the hook (liable) if something happens to one of the crew members." *Id.* The chairman further noted that "[i]t is a very unsafe environment when guys that should be focused working on high voltage, have to worry about a vindictive supervisor that is empowered because he feels he is untouchable." *Id.* He continued that "[t]o date[,] with the actions of [the company], he appears to be very untouchable." *Id.*

Palencar's interference with the employee's per diem request triggered an explosive response from the union. Dkt. 106-23, p. 3. The union sent an email to Pollack inquiring as to the investigation into plaintiff because after the per diem incident the line crew felt "cornered and desperate." *Id.* He wrote that in light of the line crew's perceptions of plaintiff, "[i]t is abundantly clear that [plaintiff] should not be in a supervisory role" during the pendency of the investigation. *Id.* Going further, the union "formally ask[ed NYPA] to remove [plaintiff] from his position" until the investigation could be completed. *Id.* The union concluded that it was "very concerned for the physical and mental safety of [its] members . . . ." *Id.*

## M. **PALENCER'S FINAL WARNING AND PLACEMENT ON LEAVE.**

On July 6, 2015, Palencar met with Senior, Toia, and the same human resources employee that he had argued with concerning the per diem issue. Dkt. 104-45, p. 2. During that meeting, Senior read to plaintiff a "Final Warning Letter" ("warning letter"). *Id.* The warning letter recounted the per diem dispute and noted that plaintiff's "inability and unwillingness to accept supervisory directives represents a continuing weakness" in his job performance. Dkt. 105-46, p. 2.

The warning letter elaborates that Palencar's "failure to implement [Senior's] directives in a timely and non-disruptive manner is unacceptable and will not be tolerated." Dkt. 105-46, p. 3. The warning letter proceeded to illustrate the varied examples of plaintiff's persistent disagreement with the decisions of his superiors despite their direct orders. *Id.* at 3-5. The warning letter concluded that given the lack of improvement in plaintiff's communication skills, the letter constituted a final warning. *Id.* at 5.

Upon being read the letter, Palencar argued that he did not know that the employee was willing to go out of town at the time he made the per diem decision, and that he has a right to ask questions of his supervisors. Dkt. 105-45, p. 2. Senior responded that questions are not a problem, but that after a few questions he expected plaintiff to stop and carry out his instructions. *Id.* The meeting notes state that plaintiff says that he "does not have any areas that need improvement and he does everything correct[ly]." *Id.* Plaintiff denies that he said this, however. Palencar Dec. ¶ 52.

Immediately following that first meeting, the same group of Palencar, Toia, Senior, and the human resources employee began a second meeting. Dkt. 105-45, pp. 2-3. To begin this meeting, Toia read plaintiff a letter announcing that plaintiff was placed on administrative leave with pay, effective immediately. *Id.*; Dkt. 105-47, p. 2. Because of his administrative

leave status, plaintiff was required to concede all NYPA property and could not engage in company business. *Id.* Plaintiff asked what he could take with him, and Toia told him that he could take anything that was not company property. Dkt. 105-45, p. 3.

According to the meeting notes, Palencar announced that he would file a lawsuit at the end of the week, that the administrative leave was "what he wanted," and that he had already requested to be placed on paid leave through the legal department. Dkt. 105-45, p. 3.

### N. <u>THE DECISION TO TERMINATE PALENCAR.</u>

On July 14, 2015, Pollack and Bodolato interviewed Palencar to conclude their investigation. Bodolato Dec. ¶ 10. Because they felt that plaintiff's presence at CEC would be disruptive, they interviewed him at the Hotel Utica. *Id.* The interview focused on the crew letter, but also touched upon plaintiff's potential violations of NYPA's meal and vehicle policies. *Id.* ¶¶ 10-11. The interviewers read from a script prepared in advance. *Id.* ¶ 10; *see* Dkt. 114-16, pp. 64-67.

On September 3, 2015, Pollack and Bodolato submitted a finalized Executive Summary recommending that NYPA terminate Palencar. Dkt. 105-50, pp. 2, 9. That same day, Senior wrote a memorandum justifying his reasoning for adopting the investigation's findings and terminating plaintiff. Dkt. 105-51, pp. 2-3. Defendants Toia, Welz, Pizzo, and Quinones, as high-ranking directors of the company, all signed, concurring in plaintiff's termination. *Id.* at 3.

On September 11, 2015, Toia wrote to Palencar, formally terminating his employment with NYPA. Dkt. 105-52, p. 2. Plaintiff used the company's Dispute Resolution Process to appeal his termination. Dkt. 107-8, ¶ 10. On December 1, 2015, defendant Pizzo, as Senior Vice President of Human Resources, notified plaintiff that she and a review committee voted to uphold his termination. Dkt. 107-10, p. 2.

## O. **PROCEDURAL HISTORY.**

On July 13, 2015, Palencar filed the first complaint in the action, concerning his allegations of retaliation between 2010 and the filing of the counselling letter on October 31, 2014.  Dkt. 1.  On November 17, 2015, he filed a second complaint, alleging retaliation and discrimination for NYPA's conduct between the counselling letter and placing him on administrative leave.  5:15-CV-857, Dkt. 1.  On February 22, 2016, plaintiff filed a third complaint, alleging retaliation and discrimination for his termination and the denial of his subsequent appeal.  5:16-CV-200, Dkt. 1.  On March 15, 2016, United States Magistrate Judge Andrew Baxter consolidated the three complaints.  Dkt. 16.  On October 20, 2016, plaintiff amended his third complaint to include the NYSHRL claims against the individual defendants.  5:16-CV-200, Dkt. 14.  On February 14, 2019, all defendants moved for summary judgment.  Dkt. 105; 106; 107; and 5:16-CV-200, Dkt. 26.  The motion has been fully briefed, and the parties' submissions will be considered without oral argument.

## III.   **LEGAL STANDARD**

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Good*, 467 F.3d 263, 272-73 (2d Cir. 2006).  Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Id.* at 273.

The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986).

Instead, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## IV.  RETALIATION

Palencar claims that defendants retaliated against him in various ways between 2014 and 2015 under Title VII, NYSHRL, and FLSA.

### A.  LEGAL STANDARD FOR RETALIATION.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court established a three-step burden-shifting framework to analyze retaliation claims.[6] The first part of that framework requires the plaintiff to "establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal citations and quotation marks omitted). An adverse employment action is any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006).

---

[6] Title VII retaliation, FLSA retaliation, and NYSHRL retaliation claims are all analyzed under the same three-step, burden-shifting framework. *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 7 (2d Cir. 2017) (summary order) (noting that Title VII and NYSHRL retaliation claims are evaluated under the same three-step, burden-shifting analysis); *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010) (noting that FLSA retaliation claims are subject to the three-step burden-shifting framework).

The plaintiff's burden in establishing a prima facie case is "*de minimis*," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks*, 593 F.3d at 164.

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a "legitimate, non-discriminatory reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citation omitted). "If the defendant meets this burden, the plaintiff must produce 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.'" *Mullins v. City of New York*, 626 F.3d 47, 53-54 (2d Cir. 2010) (citing *Weinstock*, 224 F.3d at 42). The causal connection between the protected activity and the adverse employment action must be but-for: the plaintiff must prove that absent the plaintiff's protected activity, the adverse action would not have followed. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).[7]

In proving pretext, the plaintiff may rely on "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 305 (N.D.N.Y. 2013) (alterations in original). "Despite the elaborate process set up in *McDonnell Douglas*, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in

---

[7] Although the Second Circuit has not expressly held that NYSHRL retaliation is subject to the same standard, its decisions after *Nassar*, 570 U.S. 338, seem to indicate that it is. *See Fullwood v. Sodexo, Inc.*, 2018 WL 3439866, at *6 n.2 (W.D.N.Y. July 17, 2018) (collecting cases). Several district courts have similarly found that FLSA retaliation is subject to the but-for standard of proving causation. *See Aponte v. Modern Furniture Mfg. Co., LLC*, 2016 WL 5372799, at *16 (E.D.N.Y. Sept. 26, 2016) (collecting cases).

the *McDonnell Douglas* analysis[.]" *Idrees v. City of New York*, 2009 WL 142107, at *9 (S.D.N.Y. Jan. 21, 2009) (collecting cases).

### B. **DISCUSSION.**

Palencar presents eight different protected activities:  (1) the 2010 discrimination suit; (2) the 2014 PESH complaint; (3) plaintiff's complaints regarding his FLSA exempt status; (4) plaintiff's filing a second PESH complaint on October 16, 2014, asserting that the company retaliated against him for his earlier PESH complaint; (5) plaintiff's filing charges on December 24, 2014 with the EEOC and the New York State Division of Human Rights; (6) plaintiff's filing a second charge with EEOC on March 2, 2015; (7) plaintiff's email to NYPA to complain about the stove incident; and (8) plaintiff's filing of his initial complaint in this case.

Palencar asserts that defendants retaliated against him through fourteen different means:  (1) depriving him of the right to per diem payment; (2) defendants' lack of a response as to whether he is FLSA exempt; (3) not considering him for the position of Transmission Superintendent; (4) issuing the September 2014 memorandum; (5) issuing the counseling letter; (6) removing him from his duties; (7) rating him "partially meets expectations" in his 2014 PPR; (8) tracking him through Senior's journal; (9) the stove-tampering incident; (10) issuing the warning letter; (11) placing him on administrative leave; (12) investigating him; (13) terminating him; and (14) upholding his termination on appeal.

Given that NYPA and the individual defendants have provided evidence of a non-discriminatory reason for every action that Palencar claims is adverse, the Court will proceed to determine whether he could establish that these proposed reasons are pretextual except where otherwise noted.

## 1. PALENCAR'S LOSS OF PER DIEM

NYPA has sufficiently established a non-discriminatory reason for ceasing to pay Palencar a per diem during travel.  The company notified all six Transmission Supervisors on the same day, by the same email, that the company was changing its per diem policy, and that they would all cease to be paid to travel on a per diem basis.  Dkt. 105-34, p. 2.  Plaintiff has furnished no evidence alleging that retaliating against him was of such importance to the company that they would be willing to punish every Transmission Supervisor for the sole purpose of punishing plaintiff for his protected activity.  *Id.*  Instead, the company has established that this decision was in response to an audit and was in the company's best interest.  *Id.*

Because Palencar has failed to establish that NYPA's advanced explanation is pretextual, especially because the company treated every employee similarly situated to plaintiff identically, plaintiff's claim that the company retaliated against him by removing his rights to per diem payment must be dismissed.

## 2. LACK OF RESPONSE REGARDING PALENCAR'S FLSA EXEMPT STATUS.

Palencar's argument that NYPA retaliated against him by failing to respond to his FLSA complaint is without merit.  In the counseling letter, which plaintiff received on October 31, 2014, one week to the day after he initially raised an objection to his FLSA status, Toia and Cline explained their reasoning in determining that plaintiff, like every other Transmission Supervisor, was FLSA exempt.  Dkt. 105-37, pp. 2-3.

It is unclear what, precisely, Palencar objects to.  He demanded a response regarding his FLSA status by October 31, 2014, and he received it.  Dkt. 105-37, pp. 2-3.  The counseling letter provided reasons—individualized to plaintiff—why NYPA personnel believed that he was FLSA exempt.  Dkt. 105-37, p. 2.  Moreover, plaintiff himself now admits that he

was properly exempted.  Dkt. 107-14, pp. 42-43.  Accordingly, to whatever extent the company's response to his FLSA exempt status can be considered an adverse action, the company has met its burden of establishing a non-discriminatory motive, and plaintiff has not established that motive to be pretextual.  Accordingly, plaintiff's claim concerning his FLSA exempt status, including his entire FLSA retaliation claim, must be dismissed.

### 3. NOT CONSIDERING PALENCAR FOR TRANSMISSION SUPERINTENDENT.

Palencar argues that NYPA's refusal to interview him for the position of Transmission Superintendent was also retaliatory.  NYPA submits as a non-discriminatory reason for declining to interview plaintiff that he lacked the minimum qualifications for the position, namely, a bachelor's degree.

Of the seven candidates that applied to interview for the Transmission Superintendent position, only two did not possess at least a bachelor's degree.  Dkt. 105-32, p. 2.  Of these seven, those two were the only candidates who were designated as lacking the minimum qualifications for the position.[8]  *Id.*  Accordingly, defendants have successfully established a non-discriminatory reason.

To prove pretext, Palencar asserts that all NYPA employees, including Senior, lacked the requisite qualifications much as plaintiff himself did, and thus also should have been excluded.  Dkt. 105-33, p. 2.  In particular, plaintiff asserts that Senior lacked the technical expertise the position required.  Palencar Dec. ¶ 36.  The flaw in plaintiff's reasoning, however, is that there is a great deal of subjectivity as to what is considered "technical expertise."  Plaintiff would need to prove that the company itself believed that Senior lacked the requisite expertise but decided to interview him regardless.  Plaintiff has not done so.

---

[8] It is unclear from the evidence whether the other candidate lacking a bachelor's degree received an interview. However, considering that plaintiff has not asserted that the other candidate did receive an interview, and given Toia's stated "consistent" policy of only interviewing applicants who meet the minimum requirements, the evidence suggests that he was not interviewed.  Dkt. 105-33, p. 3.

*See* Dkt. 105-32, p. 2 (company responding "yes" to question of whether Senior possessed the requisite technical expertise).  Instead, the only evidence before this Court is that plaintiff and another candidate lacked an objective requirement for the position, and the company thus deemed that they failed to meet the minimum requirements and were not interviewed.

Accordingly, Palencar has failed to prove that NYPA's assertion that the company did not interview him for his lack of a bachelor's degree was pretextual.  Accordingly, this claim must also be dismissed.

### 4. <u>THE SEPTEMBER 26, 2014 LETTER.</u>

Palencar next argues that the letter Toia sent on September 26, 2014, chastising him for photographing safety issues without acting to correct them, and for suggesting that he would not continue with his altered duties after the clearance that he had been holding, constitutes retaliation.  In assessing whether a warning to a plaintiff constitutes an adverse employment action, "[v]erbal and written warnings generally do not constitute adverse employment actions unless they lead to more substantial employment actions that are adverse."  *Bader*, 985 F. Supp. 2d 291, 306 (N.D.N.Y. 2013) (citing *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011)).  Similarly, "criticism of an employee (which is part of training and necessary to allow employees to develop, improve[,] and avoid discipline) is not an adverse employment action."  *Tepperwien*, 663 F.3d at 570.

The September 26, 2014 letter constituted only a written warning and criticism, rather than a truly adverse employment action.  *Tepperwien*, 663 F.3d at 570.  Palencar does not point to any "more substantial employment action" that followed from the September 26 letter. Accordingly, plaintiff has not established that the September 26 letter constituted an adverse action, and therefore he cannot establish his burden of proving a prima facie case of retaliation concerning this claim.  Thus, the claim must be dismissed.  *See, e.g.*, *Orsaio v.*

32

*N.Y. State Dep't of Corr. & Cmty. Supervision*, 2019 WL 3891085, at *27 (N.D.N.Y. Aug. 19, 2019) (ruling that counseling memo and meeting did not constitute an adverse employment action).

### 5.  __THE COUNSELING LETTER.__

Palencar similarly argues that the October 31, 2014 counseling letter constitutes retaliation.  However, for the same reasons discussed above, the counseling letter constitutes a written warning and criticism, and does not relate to any further disciplinary action.  Dkt. 105-37, pp. 2-4.  Accordingly, plaintiff's claims concerning the counseling letter do not constitute an adverse action.  *See Tepperwien*, 663 F.3d at 570; *Bader*, 985 F. Supp. 2d at 306.  Accordingly, plaintiff cannot meet his burden of proving a prima facie claim of retaliation, and his claims concerning the counseling letter must be dismissed.  *See, e.g.*, *Orsaio*, 2019 WL 3891085, at *27.

### 6.  __PALENCAR'S LOSS OF DUTIES.__

Palencar next argues that NYPA's altering his and Senior's respective responsibilities as Transmission Supervisors constitutes retaliation.  The company has advanced the non-discriminatory reasons for this action of plaintiff's struggles in communicating with the line crew, which created tension, as well as the January 30, 2014 union letter complaining of plaintiff's managerial style.  Dkt. 105-16, pp. 2-3.

Even though Palencar disputes that any such communication issues existed, he cannot prove that this change was pretextual.  Palencar Dec. ¶ 62.  Plaintiff's duties were changed almost immediately after NYPA received a letter from the union on January 30, 2014, outlining the line crew's strong concerns with him as a manager.  Dkt. 105-16, pp. 2-3.  Furthermore, plaintiff's only protected activity before March 3, 2014 is his 2008 lawsuit.  Dkt. 105-18, p. 2.  The company promoted plaintiff to Transmission Supervisor in 2010, while the

2008 lawsuit was still pending.  Toia Dec. ¶¶ 35-36.  Plaintiff cannot hope to prove that his responsibilities were reduced because of a protected activity when he only attained those responsibilities in the first place after the protected activity had occurred.

Additionally, Palencar settled his lawsuit four years prior to the change in responsibilities, rendering any causal connection between plaintiff's protected activity and his change in responsibilities tenuous at best.  *See Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012) (noting that although there is no "bright line to define the outer limits" of temporal proximity, "courts in this circuit have typically measured that gap as a matter of months, not years").  Accordingly, plaintiff cannot prove that his reduction in responsibilities was pretextual, and this claim must be dismissed.

### 7. <u>PALENCAR'S 2014 PPR.</u>

Next, Palencar submits that his 2014 PPR constituted retaliation.  The PPR's own terms, if true, would again constitute a non-discriminatory reason for the company to issue it.[9] Plaintiff's only argument that the 2014 PPR's criticisms were pretextual are his prima facie evidence of a retaliatory motive, a comparison to the PPR of another Transmission Supervisor, Jim Natale ("Natale"), after he engaged in misconduct, and the revision process that the company underwent in drafting the PPR.  This showing is insufficient to survive summary judgment.

Palencar's first argument, that Natale also had complaints of retaliation and threats, and yet his PPR for that year was not meaningfully affected, is unavailing.  Dkt. 114-13, pp. 2-4; 114-22.  Natale was fully investigated for the remark some members of his crew alleged of "if I go down, you'll all be going down with me."  Dkt. 114-13, p. 2.  The

---

[9] This Court assumes that the PPR would constitute an adverse action, because plaintiff's warning letter, which directly led to his termination, expressly referenced the 2014 PPR.  Dkt. 105-46, p. 3.  As such, it "le[]d to [a] more substantial employment action."  *Bader*, 985 F. Supp. 2d at 306.

investigation expressly determined that because some members of the line crew—who Natale had previously disciplined—had brought pre-written notes into the meeting and because Natale seemed credible when he was interviewed, the account likely was not accurate.  *Id.* at 3.  As such, it is unsurprising that this account would not make its way into his PPR.  Dkt. 114-22.

Moreover, unlike Natale, Palencar had been warned in his PPR every year about his difficulties communicating with his coworkers.  Dkt. 105-4, p. 13; 105-5, p. 13; Dkt. 105-13, p. 12.  These communication issues culminated in the union sending NYPA a letter requesting that plaintiff be removed from his supervisory position on January 30, 2014.  Dkt. 105-16, p. 2.  The consistent warnings as to plaintiff's communication difficulties, which finally reached critical mass with the January 30 letter, make the comparison between plaintiff and Natale ill-fitting at best.

Further, although Palencar argues that the editing process was designed to exaggerate the negative aspects of his performance, even the first draft alleged that plaintiff "carried out the new roles and responsibilities assigned to him . . . begrudgingly at best." Dkt. 114-21, p. 9.  Moreover, the PPR referred in all drafts to plaintiff's refusal to heed criticism regarding his deficiencies.  *Compare id.* at 9, *with id.* at 5, 16.  The drafts also worked to clarify, rather than add, that these deficiencies involved his abilities to communicate with subordinates and provided other examples of plaintiff's problematic behavior that comported with the counseling letter.  *Id.* at 16-17.

Additionally, Palencar's attempts to prove pretext are significantly hindered by the consistency of the 2014 PPR with his prior PPRs in identifying his communication skills as an area of significant weakness.  After all, "consistency of the viewpoint expressed" by a supervisor often "further supports" an employer's "proffered non-discriminatory reason" for

the employer's decisions.  *Weinstock*, 224 F.3d at 45 (ruling that consistency in viewpoint weakened showing of pretext in discrimination context).

Palencar, however, has made only a minimal prima facie showing to support pretext. It is true that his weakest performance in the PPR was the one filed only a few months after he admitted that he complained to PESH, but that temporal link alone is insufficient to overcome NYPA's showing of a non-discriminatory reason.  The contemporaneous notes from the September 12, 2014 meeting reinforce each specific example of insubordinate conduct and poor communication.  Dkt. 105-28, pp. 2-3.  Although plaintiff denies that he acted disrespectfully during this meeting, the notes flatly contradict him.  *Compare id.*, *with* Dkt. 114-1, ¶ 30.  In addition, Senior's journal entry for that day also corroborated the meeting notes, noting that plaintiff "indicated he will not [follow his new duties] after [three] weeks and he will [instead] be doing [Senior's] assigned duties."  Dkt. 106-6, p. 8.  The journal also stated that the "[m]eeting turned to conflict."  *Id.*

Moreover, defendants have supplied extensive evidence supporting their assertion that Palencar resisted his new role and was generally insubordinate.  First, he called for the September 12, 2014 meeting precisely because he was "very unhappy about [his] new role." Dkt. 105-21.  Second, he referred to his 2013 PPR, also criticizing him for poor communication skills but still giving him a grade of meets expectations, as a "cowardly attack" that amounted to discrimination.  Dkt. 105-20, p. 2.  In addition to the meeting notes, plaintiff's own email history demonstrates that he resisted criticism and in fact responded to it by dismissing it as discrimination.  Indeed, in two separate emails plaintiff referred to his new role as "nonsensical."  Dkt. 105-27, p. 2; 114-28, p. 1.

Considering this evidence, defendants have successfully established a non-discriminatory reason for issuing Palencar the 2014 PPR, and given that plaintiff's only

evidence of a retaliatory motive is the timing of the 2014 PPR, no reasonable jury could conclude that but for plaintiff's protected activities, the 2014 PPR would have been more favorable.

**8. SENIOR'S JOURNAL.**

Next, Palencar alleges that Senior's journal tracking his movements constituted a retaliatory act. However, defendants have supplied this Court both with the journal itself and a transcribed version of the same containing each reference to plaintiff prior to his reading the journal. *See* Dkt. 106-5; 106-6. Plaintiff does not contest the accuracy of these submissions, in fact he relies on them in his response papers. The journal does note that Senior had "been warned that [he] need[ed] to document things involving" plaintiff, but in all other respects it is unlike plaintiff's allegations of targeted surveillance. Dkt. 106-6, p. 3.

Even when examining only the January 2015 journal entries that Palencar read, on numerous occasions Senior remarks positively about him, and the journal refers to several other employees as well. *See generally* Dkt. 106-6. On January 5, 12, and 19, 2015, he wrote that plaintiff did an "excellent job" in conducting safety meetings. *Id.* at 9, 11, 12. On January 13, 2015, he noted that he mentioned to plaintiff that his letter arguing that plaintiff should take the lead as a Transmission Supervisor, and that promoting a second Supervisor was unnecessary, was "cordial" and the proper way to address differences. *Id.* at 11.

Upon review of the journal itself, it is evident that the journal cannot constitute an adverse action. No reasonable juror could conclude that Senior's writing down both positive and negative interactions with a coworker, as well as the same with every other coworker, would dissuade a reasonable employee from engaging in protected conduct. *Kessler*, 461 F.3d at 207. Similarly unpersuasive is plaintiff's argument that Senior being told to write down his interactions with plaintiff constituted surveillance. *See* Dkt. 106-6 p. 3. Being

ordered and warned are two very different things, and plaintiff had already shown a well-documented tendency of resisting authority and meeting criticisms and disagreements with allegations of discrimination.  Dkt. 105-20, p. 2.  Accordingly, plaintiff has failed to establish that Senior's journal constituted an adverse action, and his claim concerning the journal must be dismissed.

### 9. <u>THE STOVE-TAMPERING INCIDENT.</u>

Palencar next argues that the various stove tampering incidents were retaliatory.  In evaluating whether an act constitutes retaliation, it is worth noting that "petty slights or minor annoyances that often take place at work and that all employees experience" are not materially adverse.  *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Placing the EAP pamphlets on the stove, even assuming the gesture was intended by the line crew to suggest to plaintiff that he needed mental help, constitutes only a petty slight, as does the line crew's unscrewing the light bulbs above the stove.  Dkt. 105-42, p. 2.

Drawing Palencar's allegations in the most favorable possible light, this Court assumes that tampering with the burner dial could present a risk of electric shock.  Nevertheless, that act is not attributable to NYPA, because as soon as the dial was tampered with and the company became aware of the varied stove incidents, Senior immediately released a letter condemning the actions and ordering that they cease.  Dkt. 106-17, p. 2.  After that letter, there were no further incidents involving the stove.  Dkt. 105-43, p. 3.  Thus, to any extent that the stove tampering could be considered adverse, it is not an adverse employment action, because plaintiff's employer immediately acted to stop the employees' tinkering with the stove as soon as it became aware of it.

To the extent that Palencar argues that the relative lack of an investigation into the stove constitutes an adverse action, this argument similarly fails.  Plaintiff never initiated a

formal complaint as to the stove, and even at the time Senior had stated that he would fully and formally investigate it if plaintiff did formally complain.  Dkt. 106-17, p. 2.  Absent that, NYPA still engaged in a security investigation, interviewed plaintiff, and determined that, because the stove incidents had stopped, there was no need to continue the investigation.  Dkt. 105-43 pp. 2-3.  The company also determined that such an investigation would be unlikely to bear fruit.  *Id.*  Plaintiff cannot demonstrate that a reasonable investigation—undertaken without plaintiff even filing a complaint—constituted an adverse action.  Thus, plaintiff's claims concerning the stove must be dismissed.

**10.** **THE WARNING LETTER.**

Palencar next argues that NYPA's giving him the warning letter was retaliatory.  The company has asserted a non-discriminatory reason for issuing the warning letter in the text of the letter itself.  Plaintiff therefore must prove that these reasons are pretextual.  To do so, plaintiff argues that:  (1) Senior exaggerated or fabricated the extent of the disagreement between plaintiff and the line crew on January 23, 2015; (2) the company had not seen the signature page of the crew letter prior to issuing the warning letter; and (3) that the company did not follow its performance improvement policies concerning his alleged communication difficulties.

First, it is true that Senior's description of the January 23 conversation between plaintiff and the line crew is not entirely consistent with the warning letter.  *Compare* Dkt. 106-6, p. 13 ("These are healthy discussions."), *with* Dkt. 105-46, pp. 3-4 ("I interceded and stopped the conversation before it got out of hand.  I spoke to you afterwards and stated that a better way to handle that type of situation would be to explain to the crew the reasoning behind your decision instead of just issuing orders.").  The two accounts are not entirely inconsistent

either, however, because it is possible for a conversation to be "healthy" yet still demonstrate room for improvement.

Nevertheless, Palencar is correct to note that the two interpretations are sufficiently different to undermine the credibility of this allegation. However, the January 23 incident was only one of several incidents identified in the warning letter, the remainder of which are strongly corroborated. Accordingly, although the discrepancy in language does bolster plaintiff's argument of pretext somewhat, it is far from sufficient on its own to meet his burden. *Cf. Timothy v. Our Lady of Mercy Med. Ctr.*, 233 F. App'x 17, 20 (2d Cir. 2007) (ruling in Title VII discrimination action that "[e]ven assuming . . . that inconsistencies or other indicia of pretext [we]re present, they would not here support, either alone or in conjunction with the other evidence, an inference that discrimination . . . was the real reason for any of the[] allegedly adverse actions").

Second, Palencar's argument that varied members of NYPA's management had not personally seen the signature page of the crew letter—even though Toia stated that the signatures of all fifteen line crew members were an important concern in issuing the warning letter—allows for a finding of pretext is meritless. Although Toia affirmed that the unanimity of the signatures was an important concern, the fact that he had not physically seen the signatures does not preclude his knowledge that they existed. Toia Dec. ¶ 155; Dkt. 114-17, pp. 33-34.

On the contrary, NYPA received the signed crew letter, and human resources saw the signature page, but decided to forward the letter with the signatures themselves removed. Dkt. 114-17, pp. 33-34; *see* Dkt. 114-20, p. 1. The same human resources employee who informed the other company employees of the letter noted that it "had been sign[ed] by the entire crew." Dkt. 114-20, p. 1. Accordingly, that management had never seen the physical

signatures is of no moment, because they nevertheless knew that it was signed by all fifteen members. *Id.* Palencar's argument that this undermines the credibility of the warning letter is frivolous.

Third and finally, Palencar's argument that NYPA never provided him with written short-term goals for improvement, as mandated by company policy, is also unavailing. First, each PPR did provide plaintiff with a written improvement plan including objectives to complete during a defined period. Dkt. 105-5, p. 13 (noting in 2012 PPR that plaintiff "needs to focus on developing his communication skills . . . through attendance at NYPA's Professional Development training"); 105-13, p. 14 (recommending in 2013 PPR that plaintiff attend continuing education and public speaking classes); 105-40, p. 14 (recommending training classes and other training to "develop positive leadership techniques and motivational skills").

Second, communication is an abstract concept that cannot be quantified into written short-term performance goals. It is thus unsurprising that the company did not construct some arbitrary means of measuring Palencar's communication. Third, plaintiff was informed multiple times, between the September 26, 2014 letter and the counseling letter, that his communication difficulties would no longer be tolerated. Dkt. 105-30, p. 2; 105-37, p. 3. As a result, the record evidence shows that to the extent possible, the company complied with their improvement policy.

In summary, Palencar's only proffered arguments for a jury to find pretext are one potential exaggeration of a minor portion of the warning letter, and his prima facie case. Again, plaintiff has pointed to no direct evidence linking his protected activities to the warning letter. Instead, he relies exclusively on temporal proximity to establish his prima facie case. The mere four months between his most recent protected activity of filing a claim against

NYPA with the EEOC in March before the warning letter was issued in July is sufficient to establish that prima facie case. However, even bolstered by the warning letter's exaggeration of the January 23, 2015 conversation, it is insufficient to overcome defendants' showing of a non-discriminatory reason to issue the warning letter.

NYPA was faced with a letter from every employee working under Palencar objecting to his managing style and "implor[ing] that [the company] decisively address th[e] dangerous situation[.]" Dkt. 105-44, p. 4. In addition, the union representing the line crew had further urged the company to remove plaintiff from his position. Dkt. 106-23, p. 3. Senior, as both plaintiff's equal and supervisor at different times, had noted a series of conflicts with plaintiff in his journal. Dkt. 106-6, pp. 9-12.

Moreover, Toia had twice in the past year formally censured Palencar for unprofessional conduct and confrontational behavior. Dkt. 105-30, p. 2; 105-37, p. 3. Plaintiff's opposition to his superiors' decisions in granting a member of the line crew per diem pay and the several other examples that defendants marshalled in the warning letter as evidence that plaintiff was obstinate and resistant to authority provide a compelling non-discriminatory motive to terminate plaintiff. Dkt. 105-44; 106-23, p. 2.

Faced with pressure to act from every actor who had anything to do with Palencar, the evidence that removing him from his position and investigating the viability of his employment was the best path forward for NYPA is staggering. Given such a potent argument for a non-discriminatory reason to provide plaintiff with the warning letter, plaintiff's attempts to prove pretext fail, and his claims concerning the warning letter must be dismissed.

**11. PLACEMENT ON PAID ADMINISTRATIVE LEAVE.**

Palencar's placement on administrative leave flows directly from the warning letter, because the two were part of the same employment decision.  Accordingly, the analysis is much the same.  However, particularly salient to NYPA's placement of plaintiff on leave is the urgency with which the union and line crew asked for him to be removed and their strong concerns as to his continuing authority over the line crew.  Dkt. 106-23, pp. 3, 4; 114-20 pp. 2-4.  Given the sheer weight of the company's evidence that retaliatory animus was not the but-for cause of the warning letter and his subsequent placement on paid administrative leave, plaintiff's claim concerning the company's placing him on leave must also be dismissed.

## 12. THE NYPA INVESTIGATION.

Palencar next argues that NYPA's conduct in investigating him constituted retaliation.  In particular, he objects to the company's extensive examination of the GPS data of his company vehicle, and to the determination that he had violated the company's meal policy.[10] In particular, he points to the dispute between the legal department and accounts payable as to whether he actually violated the meal policy, and an employee's statement in a meeting that she didn't "like the appearance of looking back" through four months of plaintiff's GPS records.  Dkt. 114-16, p. 95.

First, the fact that there was some disagreement as to whether Palencar complied with the meal policy when he would purchase multiple meals, purchase chips or chocolates in bulk in addition to meals, or purchase grocery items and seek reimbursement provides some evidence of pretext.  However, the evidence also indicates that the company was taking

---

[10] If plaintiff additionally seeks to argue that the fact that he was investigated at all constitutes retaliation, the company's investigation into the employee that plaintiff presents as a comparator, Natale, for some similar conduct precludes any finding of retaliatory motive given the company's evidence of the same non-discriminatory reasons that motivated the warning letter and plaintiff's paid leave.  *See generally* Dkt. 114-13 (describing Natale investigation).

pains to find comparators and ensure that they did not treat plaintiff "differently than everyone else." Dkt. 114-16, pp. 76-77. NYPA's accounts payable identified other examples of similar violations that were deemed inappropriate, such as trips to the drug store, and distinguished plaintiff's case from others that were approved based on the sheer amounts of food that plaintiff purchased. *Id*. at 62. These distinctions are a sufficient non-discriminatory reason to at least investigate whether plaintiff violated the meal policy, and weaken plaintiff's showing of pretext.

Second, there is record evidence of a non-discriminatory reason for NYPA to investigate Palencar's GPS data. Specifically, Senior had expressed a concern that plaintiff was visiting his home during the work day to check on his ongoing renovations. Dkt. 114-16, p. 75. Additionally, there were allegations that plaintiff would use his company vehicle to drive to observe Wiggins' crew, but not other crews. *Id*. at 93. Accordingly, these two bases provide a non-discriminatory reason for the company to examine plaintiff's GPS history.

For his part, Palencar has made a showing of pretext. The evidence that he provides of NYPA employees expressing concern at the "appearance" of tracking his GPS for four months, as well as concern as to whether they were applying a different standard in evaluating his meal usage is not insubstantial. Dkt. 114-16, pp. 62, 95. A reasonable jury confronted with this evidence would be well within its rights to believe that the company was fishing for any reason that it could find to get rid of plaintiff, and that this was the ultimate motivating force behind delving into plaintiff's meal policy and vehicle use violations.

It is, of course, permissible to infer the ultimate fact of discrimination from an employer's false explanation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). Nevertheless, "[a]n employer's reason for an adverse action cannot be proven to be a pretext for retaliation unless it is shown to be false *and* that retaliation was the real

reason[.]" *Hexemer v. Gen. Elec. Co.*, 2015 WL 3948418, at *9 (N.D.N.Y. June 29, 2015) (citing *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995)).

Even assuming that NYPA's reasons for investigating Palencar's meal receipts and vehicle usage were pretextual, his evidence that that pretext was to cover a true motive of retaliation is paltry and insufficient to carry his burden. Again, plaintiff relies exclusively on the fact that he had levied several and varied complaints against the company, and that after these complaints he faced disciplinary action. Temporal proximity can carry some measure of his burden, but not enough in light of the overwhelmingly consistent story the evidence tells.

Looking back across NYPA's relationship with Palencar as a whole, he endured inexcusable discriminatory language from his coworkers in 2008, which his supervisors failed to stop. For that reason, he attained a settlement against the company, and despite his lawsuit and settlement, he nevertheless received a promotion. Immediately following that promotion, however, he wasted no opportunity to use the law to coerce the company in his favor.

When Palencar did not like the changes to his role, he declared it "nonsensical" and demanded that it be changed back. Dkt. 114-28, p. 1. He then filed the PESH complaint, which he leveraged to change that role. *See* Dkt. 105-26, p. 3. Plaintiff also declared that NYPA's labeling him FLSA exempt—which was accurate and applied equally to every employee in his position—constituted retaliation. Dkt. 114-49. When plaintiff was censured through the counseling letter for his well-documented communication issues, he declared this, too, to be retaliatory. Dkt. 105-38, p. 2. Even Senior's journal received plaintiff's label of retaliation. Dkt. 114-32, p. 2. Every interaction between plaintiff and the company after 2010 which did not actively favor plaintiff was met with an allegation of retaliation.

45

On the other hand, NYPA faced increased pressure and scrutiny from the union, which increasingly pressured the company to fire Palencar at the constant urging of the line crew. Dkt. 106-23, pp. 3-4. The union also insinuated that the company would be liable because of plaintiff's conduct and their failure to remove him. *Id.* at 4.

In short, Palencar and the union had placed NYPA in an impossible situation. If they fired plaintiff, they knew beyond a shadow of a doubt that this lawsuit would follow. If they did not, however, any injuries to plaintiff's line crew would immediately result in a lawsuit, supported by the union, for the company's keeping plaintiff employed. In that context, and especially with the abundant evidence of progressive discipline against plaintiff without success, as well as constant struggle with plaintiff from every level of the company, the company needed to terminate plaintiff's employment, but needed to insulate themselves from plaintiff's inevitable lawsuit.

Palencar's incapability of proving a retaliatory motive only grows clearer upon review of the same notes from the June 24, 2015 meeting that he relies on to prove pretext. Those same meeting notes that note that company employees did not "like the appearance" of reviewing his GPS data make no mention of his prior complaints. *See generally* Dkt. 114-16, pp. 93-104. Instead, repeated reference is made to allegations of plaintiff's "hate speech," the fact that he is "difficult," his numerous instances of disagreement with his superiors' directives, and the generally "bad environment" that plaintiff creates. *Id.* Nearly every word of those meeting notes evinces a need to make plaintiff's clearly merited termination "as strong" as the company could. *Id.* at 98.

Perhaps—and a reasonable jury could certainly conclude—NYPA did exceed the typical scope of its disciplinary investigation with respect to Palencar. Its submitted reasons of investigating plaintiff's vehicle and meal reimbursement use are both subject to evidence of

pretext. However, the only compelling, non-speculative narrative that the evidence tells is the company's desperation to protect itself from liability in any way possible from the decision that it had already reached—and that circumstances already necessitated—of firing plaintiff.

Accordingly, even though it would be *permissible* for a reasonable factfinder to infer a retaliatory motive from NYPA's explanations for the scope of their investigation into plaintiff, no reasonable finder of fact would make that permitted inference when confronted with the clear goal of the company to meritoriously, and necessarily, fire plaintiff. *Reeves*, 530 U.S. at 147. Plaintiff has thus failed to meet his burden of proving a retaliatory motive, and his claims regarding his investigation must be dismissed.[11] *Hexemer*, 2015 WL 3948418, at *9.

### 13. <u>PALENCAR'S TERMINATION.</u>

In terminating Palencar, NYPA relies on much of the same evidence accumulated up to this point. However, the company's reasons for terminating plaintiff are bolstered by the results of the investigation and the interviews with twenty-five company employees who interacted with plaintiff daily. *See generally* Dkt. 105-50. Those twenty-five employees consistently declared that plaintiff was incredibly difficult to work with. *Id.*

Against this showing of a non-discriminatory reason, Palencar asserts many of the same arguments of pretext for his termination as he asserted for his warning letter. The only additional bases that he argues are: (1) the executive summary exaggerated the report of the line crew member who complained about being made to cut trees in heavy snow,

---

[11] Plaintiff has asserted individual liability claims of NYSHRL retaliation for Pollack and Bodolato for their role in investigating him. "[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if [s]he actually participates in the conduct giving rise to a discrimination [or retaliation] claim[.]" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (internal citations and quotation marks omitted). Because plaintiff has failed to state an actual retaliation claim, his individual claims against Pollack and Bodolato must also be dismissed. *See Brevil v. Cty. of Rockland*, 2017 WL 4863205, at *4 (S.D.N.Y. Oct. 26, 2017) (noting that where "plaintiff has failed to allege an adverse employment action sufficient to state a retaliation claim," that plaintiff has also failed to "allege[] a NYSHRL retaliation claim against any of the individual defendants"), *cf. Wenchun Zheng v. Gen. Elec. Co.*, 2016 WL 10859373, at *5 (N.D.N.Y. Jan. 12, 2016) (holding in discrimination context that "if the employer is found not liable for violating the NYSHRL, the individual employee cannot be held liable either").

because in his journal he only described the snow as "moderate"; (2) his violations of NYPA vehicle policies were only *de minimis* and he did not violate the meal policy; and (3) comparator evidence demonstrates that his termination was pretextual through similarly situated employees who were not terminated for similar misconduct.

First, Palencar's arguments concerning the extent of the snowfall during the incident his line crew member complained of in no way change the analysis.  That one employee might have slightly exaggerated while being interviewed, or that the interviewer herself might have slightly exaggerated the results of the interview, do not meaningfully suggest that NYPA used that information as a pretext.  The difference between a "moderate" and "severe" snowfall is irrelevant, especially in light of the array of additional evidence necessitating that the company fire plaintiff.

Second, although it is true that there was a dispute among NYPA personnel as to whether Palencar violated the meal policy, the ultimate determination was that he did.  It is hard to fault a finding of violation where plaintiff had on multiple occasions purchased two full meals for himself, and on others had purchased a meal for himself and additionally had bought more food in bulk.  Dkt. 114-16, p. 62.  Other employees had also faced discipline for similar violations.  *Id.*  Although plaintiff argues that other employees had purchased gift cards using the meal reimbursement program and had not faced discipline, the fact remains that he was determined to have violated the policy, and others who were similarly situated had been disciplined for similar violations.  Thus, plaintiff cannot prove that the inclusion of a meal violation was merely pretextual.

Similarly, although Palencar's vehicle policy violations were relatively minor, they were nevertheless violations.  Using these policy violations to support a termination on their own might have helped plaintiff prove that the company's supplied reasons for terminating him

were pretextual, as cumulative evidence supporting that decision, they do not meaningfully undermine the other evidence the company marshalled.

Furthermore, Palencar's reliance on company policy violations on the part of another supervisor who would take employees to strip clubs in Canada is also misplaced. These trips occurred at the latest in 2003, and plaintiff nowhere argues or provides evidence that this other employee was subject to the same rules of discipline or supervision that plaintiff was. Dkt. 114-39, pp. 9-12 (NYPA employee testifying at deposition concerning supervisor taking line crew to Canada); *cf. McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (ruling that in discrimination context plaintiff must be similarly situated to purported comparator in all *material* respects) (emphasis in original). Accordingly, plaintiff and this employee would not be similarly situated in a material respect of disciplinary regime, and this comparison does not help plaintiff establish pretext.

Third, Palencar's reliance on comparator evidence for his termination3 is misplaced. For his first example, he relies again on Natale. At Natale's own request, he was investigated based on rumors: (1) that he had asked a member of his line crew to drop off a company bulldozer at his home for his personal use; (2) that he had ordered the same lineman to use a piece of company equipment to mow his property; (3) that he had on another occasion asked a lineman to drop off a woodchipper at his home; (4) of instances of company equipment being used by homeowners with his permission when the equipment would be left in the homeowners' neighborhoods, and (5) his threatening his line crew with "if I go down, you'll all be going down with me." Dkt. 114-13, pp. 1-3.

NYPA investigated these allegations by meeting with Natale, and then meeting with his line crew. He admitted that he had taken a dump truck loaded with "millings" to his home to repair his driveway after a flood washed it out. Dkt. 114-13, p. 1. Natale accepted that

this was improper.  *Id.*  He disputed the mowing story, and instead stated that he had taken some members of the line crew to try out new equipment.  *Id.* at 1-2.  He flatly denied the remaining allegations.  *Id.* at 2-3.

NYPA determined that Natale's testimony was credible, and additionally found that two of his accusers were not credible, because they came with pre-written notes, and had faced criticism from Natale for their work performance.  Dkt. 114-13, p. 3.  Additionally, most of the conduct alleged had taken place years prior.  *Id.*  Ultimately, Natale received a letter in his file reminding him of company policies.  Dkt. 114-14.

Palencar also notes that on August 6, 2015, Natale received a warning letter for directing his line crew to travel over a bridge in a truck that exceeded the bridge's weight limit.  Dkt. 114-12.  He had immediately notified Senior, his supervisor, about the incident and "acknowledged an error in judgment."  *Id.*  Nevertheless, his supervisor entered a letter in his file that the company "expect[ed] immediate and consistent improvement; [and] failure to do so may result in disciplinary action up to and including termination of [his] employment"  *Id.*

In some respects, the comparison between Natale and Palencar is apt.  Both had the same role in NYPA, both faced allegations of misconduct from their subordinates, those allegations were investigated, and both faced progressive discipline.  Indeed, Natale was told in no uncertain terms that if he had similar incidents in the future, he would risk termination.  Dkt. 114-12.

However, the distinctions between Palencar and Natale are nevertheless pronounced.  First, in every instance, Natale openly accepted blame and brought his misconduct to NYPA's attention.  Dkt. 114-12; 114-13, p. 1.  Additionally, the company's investigation into Natale found the misconduct to be exaggerated for specifically articulated reasons.  Dkt. 114-13, pp. 3-4.  By contrast, plaintiff faced the same problems of inappropriate communication with

his subordinates and with his superiors time and again and responded with denials and allegations of retaliation.

Additionally, Palencar's entire line crew signed a letter asking him to be removed from his post, unlike Natale. Dkt. 105-44. Although plaintiff correctly notes that his safety record is superior to Natale's, the evidence consistently demonstrates that his pronounced lack of managerial skills mortally wounded his employment at the company, regardless of his safety record. Accordingly, in total, plaintiff's comparison to Natale does not meaningfully advance his argument that the company's reasons for firing him were pretextual.

Palencar was terminated for any number of reasons, but the consistent statements of his entire line crew—and every other employee interviewed by Pollack and Bodolato—that plaintiff could not be worked with, significantly bolstered NYPA's case for terminating him. Dkt. 105-50. Against this evidence, plaintiff's few additional arguments of pretext amount to little. Thus, just as the company successfully demonstrated a non-pretextual reason for placing plaintiff on leave, they have if anything made an even stronger showing that plaintiff was fired for non-pretextual, non-discriminatory reasons. Plaintiff's claim that his termination constituted retaliation must be dismissed.[12]

### 14. UPHOLDING PALENCAR'S TERMINATION.

As discussed above, NYPA had several valid, non-discriminatory reasons to terminate Palencar's employment, none of which has plaintiff proven to be pretextual. Because the initial termination was valid and did not constitute a discriminatory employment action, the

---

[12] Similarly, plaintiff's inability to demonstrate a valid claim of retaliation against NYPA is also fatal to his individual claims against defendants Quinones, Pizzo, Toia, Welz, and Senior. *See Brevil*, 2017 WL 4863205, at *4.

company's upholding that valid determination similarly cannot constitute a retaliatory act. Therefore, plaintiff's claims concerning his termination must be dismissed.

### 15. SUMMARY OF PALENCAR'S AGGREGATED CLAIMS.

In light of the foregoing analysis, even assuming that Palencar has sufficiently established a prima facie case of retaliation, NYPA and the individual defendants have advanced a non-discriminatory reason for every adverse action that he alleges. Moreover, plaintiff has failed to prove that those reasons were pretextual, or that a reasonable jury could conclude that retaliation for plaintiff's protected activities was the but-for cause of the adverse actions.

On the contrary, every subsequent allegation of a retaliatory act only serves to underscore Palencar's contentious relationship with the company and his resistance to every order and criticism that he did not completely agree with. Accordingly, plaintiff's Title VII, NYSHRL, and FLSA retaliation claims must be dismissed with prejudice.[13] *See, e.g.*, *Kemp v. A&J Produce Corp.*, 164 F. App'x 12, 16 (2d Cir. 2005) (ruling that plaintiff could not prove pretext where he was terminated for "insubordination rather than as punishment" for a protected activity when his supervisor "had felt threatened by plaintiff's tone and close proximity" during a prior altercation, and plaintiff had received "several employee warnings in the past").

## V.     SECTION 740 RETALIATION

To state a cause of action under § 740, "a plaintiff must allege facts supporting the conclusion that (1) he was subject to a retaliatory personnel action after (2) disclosing to a supervisor [or public body] (3) a practice of the employer that is in violation of a law, rule, or

---

[13] Indeed, even if this Court were to apply the "motivating factor" standard of causation to plaintiff's FLSA and NYSHRL claims, the overwhelming weight of defendants' evidence would still preclude plaintiff from proving pretext. *See Fullwood*, 2018 WL 3439866, at *6 n.2; *Aponte*, 2016 WL 5372799, at *16.

regulation (4) that creates and presents a substantial and specific danger to the public health or safety." *Barber v. Von Roll U.S.A., Inc.*, 2015 WL 5023624, at *14 (N.D.N.Y. Aug. 25, 2015) (alterations in original).

"[T]he provisions of [§ 740] regarding retaliatory discharge are to be strictly construed." *Cotrone v. Consol. Edison Co. of N.Y., Inc.*, 856 N.Y.S.2d 48, 48 (App. Div. 1st Dep't 2008). Thus, it is a defense under § 740 if the defendant proves that the decision to terminate the plaintiff was "predicated upon grounds other than the employee's exercise of any rights protected by" § 740. N.Y. LAB. LAW § 740.4(c). In other words, the plaintiff must "demonstrate a causal nexus—*i.e.* that the adverse employment action was taken 'because' of his disclosure or threatened disclosure of the violation." *Rivera v. AffinEco LLC*, 2018 WL 2084152, at *3 (S.D.N.Y. Mar. 26, 2018).

For the same reasons discussed above, every instance of discipline recounted in plaintiff's first complaint was predicated on the non-pretextual bases of his ongoing combative relationship with his superiors, and his line crew's and the union's strong and repeated calls for plaintiff's removal from his supervisory role. Accordingly, defendants have sufficiently established the defense that plaintiff's PESH complaint was not the predicate for: (1) changing plaintiff's duties;[14] (2) labelling plaintiff FLSA exempt; (3) not interviewing plaintiff for Transmission Superintendent; and (5) issuing plaintiff the counseling letter. Plaintiff's § 740 claims must therefore be dismissed. *Reda v. St. Johnland Nursing Ctr.*, 7 N.Y.S.3d 409, 410-411 (App. Div. 2d Dep't 2015) (dismissing § 740 complaint because "termination of the plaintiff's employment was predicated upon his inappropriate actions and abusive behavior over a period of more than two years, rather than his exercise of rights protected by" § 740).

## VI.  DISCRIMINATION

---

[14] Additionally, this employment action occurred on March 3, 2014, before plaintiff's PESH complaint, and therefore was never cognizable under § 740. Dkt. 105-18, p. 2; 105-25, p. 2.

Palencar alleges that NYPA and the individual defendants discriminated against him based on his identification as a gay man through four employment actions: (1) his 2014 PPR; (2) the warning letter; (3) the investigation; and (4) his termination.

## A. **LEGAL STANDARD FOR DISCRIMINATION.**

In proving a claim for discrimination under Title VII, the plaintiff bears the burden of showing that he: "(1) is a member of a protected class; (2) was qualified for the position at issue; (3) was denied the position; and (4) that the circumstances of the adverse employment decision give rise to an inference of discrimination." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003).[15] In *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 111-13 (2d Cir. 2018), the Second Circuit ruled that people that identify as homosexual are a protected class for purposes of Title VII.

Once the plaintiff meets their initial burden, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the defendant does so, "the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for . . . discrimination . . . ." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). "[T]he employee's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination." *Id.* (alterations in original).

Plaintiff need not prove that discrimination was the but-for cause of the employment action, but instead need only prove that "the motive to discriminate was one of the employer's

---

[15] The analysis for plaintiff's NYSHRL discrimination claims is the same. *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 59 (2d Cir. 2012) (ruling that NYSHRL and Title VII discrimination claims "are analyzed identically").

motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

## B. DISCUSSION.

There is little dispute that Palencar, as a gay man, is a member of a protected class. *See* Palencar Dec. ¶ 7. Similarly, defendants do not dispute that plaintiff was qualified for his position. Plaintiff was also fired from his position of Transmission Supervisor. Dkt. 105-52, p. 2. The only dispute is whether plaintiff met his prima facia burden of proving that the circumstances surrounding his employment give rise to an inference of discrimination.

Determining whether the circumstances surrounding an employment action give rise to an inference of discrimination is a "flexible [inquiry] that can be satisfied differently in differing factual scenarios." *Howard v. MTA Metro-North Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011). "A showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination[.]" *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F. 3d 456, 468 (2d Cir. 2001)).

In proving an inference of discrimination, Palencar relies on: (1) the improper comments directed toward him which formed the basis of the 2008 lawsuit; and (2) comparator evidence in the form of Natale and Wiggins, and (3) the legal department's expressed concern that NYPA was "applying a different standard to" him. None of these arguments are persuasive.

First, Palencar's allegations of a discriminatory animus arising from the vulgar comments of the line crew are both remote in time and unconnected to any NYPA employee capable of making an employment decision affecting him. The latest incident that he alleges in which any company employee referred to his sexual orientation occurred on December 3,

2010, when Wiggins made vulgar comments concerning plaintiff and a contractor, for which he was disciplined. Dkt. 114-7, pp. 1-2; 114-8. In every intervening year before the submission of plaintiff's 2014 PPR, his first claimed discriminatory act, the record is utterly silent as to any mention of plaintiff's orientation. Though clearly inappropriate, these comments struggle to overcome the lack of any subsequent incidents in the years following plaintiff's settlement of the 2008 lawsuit.

Second, Palencar's comparator evidence is less than compelling. As discussed above, Natale is a poor fit, considering his willingness to accept responsibility, the more favorable results of his investigation, and the fact that he was, in fact, disciplined for the conduct that plaintiff points to. Dkt. 114-12; 114-13, pp. 1-4. Again, plaintiff faced more severe punishment, but his misconduct was more severe and over a more extended period. Plaintiff received multiple warnings and progressive discipline, much as Natale did, but the record demonstrates that plaintiff refused to alter his course. Combined with the crew letter, plaintiff's refusal to change his treatment of his co-workers provides a significant difference between his case and Natale's. Plaintiff's termination is thus justified, even though Natale is still employed.

Palencar's use of Wiggins as a comparator is similarly flawed. As plaintiff himself notes, the two occupy very different roles at NYPA. This alone substantially dampens his efficacy as a comparator. *See McGuinness*, 263 F.3d at 53 (ruling that comparator "must be similarly situated in all *material* respects") (emphasis in original). However, even were he and plaintiff to be more similarly situated, the comparison still would not serve plaintiff well.

Wiggins' vulgar comments to Palencar when plaintiff was his supervisor were certainly worse than any comments made by plaintiff in this record. Dkt. 114-7, p. 1. But Wiggins was issued a reprimand for those comments and was told that any further comments could

subject him to "further disciplinary action, up to and including termination of employment." *Id.* at 2. Palencar's first incident of improperly addressing his supervisors resulted in the September 26, 2014 letter, which stated that insubordination would not be tolerated, but took no further action. Dkt. 105-30, p. 2. It was only after several such instances—and NYPA's receipt of the crew letter—that plaintiff was finally terminated. Accordingly, to whatever extent Wiggins and plaintiff were similarly situated, plaintiff has failed to demonstrate that they were treated meaningfully differently.

Additionally, it is telling that Palencar relies on multiple different comparators, not all of whom are similarly situated, to argue that his termination was discriminatory. None of the employees he refers to were fired for their misconduct, true, but none of them had the full gamut of his misconduct. Plaintiff's arguments lose sight of the fact that his termination, and his varied other alleged discriminatory employment actions, were the result of aggregate acts during an ongoing, years-long relationship. He was not terminated because of his vehicle violations alone, or a single incident of inappropriately speaking to a supervisor. He was terminated because after years of the same difficulties and misconduct, including his violations of the vehicle and meal policies, and especially after his line crew effectively mutinied through the crew letter, his employment was no longer tenable.

Turning to Palencar's arguments concerning the comment of "applying a different standard" to him, this comment was addressed in part above. Dkt. 114-16, p. 62. However, it also bears mentioning that the NYPA employee in question merely expressed a concern that they were treating plaintiff differently, which another employee refuted on the same page by pointing to a similar violation that resulted in discipline. *Id.* The concern that the company employee expressed as to whether the company was treating plaintiff fairly causes some

pause, but in these circumstances, it is insufficient to create an inference that any difference in treatment was caused by plaintiff's sexual orientation.

Palencar's arguments thus fail to establish that the circumstances surrounding his last year of employment at NYPA create an inference of discriminatory intent for any of the four acts that he alleges were discriminatory. Rather, the record evidence as to the circumstances surrounding Palencar's 2014 PPR, the warning letter, his investigation, and his termination, demonstrate that the company acted as it needed to in criticizing, disciplining, and eventually firing plaintiff for the reasons discussed *supra* in sections IV(B)(7, 10, 12-13).

It is impossible for a reasonable jury to infer that Palencar's sexual orientation played a motivating role in his 2015 employment on this record. His repeated obstinacy in carrying out his new duties and the January 30, 2014 union letter are far more compelling than plaintiff's showing of discrimination, even in his 2014 PPR grading him at "partially achieves expectations." Dkt. 105-16, pp. 2-3; 105-27, p. 2; 114-28, p. 1. After the PPR, plaintiff advances no new bases of a discriminatory animus, but repeated allegations of his misconduct from every corner of NYPA as his employment continued only make his road to proving an inference of discriminatory animus more difficult with each subsequent employment action.

The evidence in this action is equal parts exhaustive and exhausting, and the common thread is that working with Palencar during his final two years of employment was a constant struggle. Plaintiff cannot hope to prove that the circumstances create an inference of discrimination in the face of two years of contemporaneous records of his subordinates, equals, and supervisors—even the entire union—all lamenting plaintiff's onslaught of needless challenges and empty assertions of victimhood.

Far from establishing an inference of discrimination, the evidence establishes with perfect clarity that Palencar used his identification as a gay man to hold NYPA hostage. Moreover, even if a reasonable jury could find that plaintiff presented an inference of discrimination, defendants' evidence of plaintiff's inability to civilly communicate with his subordinates and superiors is a valid, non-discriminatory reason for the company's employment actions, and plaintiff cannot prove that these reasons were pretextual or that discriminating against him for his sexual orientation constituted even a "motivating factor" in terminating him for any act which he alleges was discriminatory.

Accordingly, Palencar's claims of discrimination under Title VII must be dismissed.[16] *See, e.g.*, *McGill v. Univ. of Rochester*, 600 F. App'x 789, 791 (2d Cir. 2015) (summary order) (concluding that "detailed and consistent concerns with [plaintiff]'s work performance" were sufficient to carry defendant's burden of non-discriminatory reason for firing plaintiff and plaintiff could not prove pretext).

## VII.    CONCLUSION

Title VII and similar legislation are a shield put in place by legislatures to secure disadvantaged groups against unlawful discriminatory practices.  They are not a sword to secure employment or to procure benefits from and judgments against employers solely because a would-be plaintiff belongs to a protected class.  Palencar attempted to use them as such and may now find their edge dull.  He cannot establish that his sexual orientation played a role in his varied impositions of discipline in the face of his ongoing, well-documented pattern of confrontational and insubordinate behavior.  Nor can he prove that retaliation for his varied complaints against NYPA, rather than that same behavior,

---

[16] Again, because the Court finds that NYPA did not discriminate against plaintiff, his complaints against the individual defendants similarly must be dismissed.  *Wenchun Zheng v. Gen. Elec. Co.,* 2016 WL 10859373, at *5 (N.D.N.Y. Jan. 12, 2016).

caused those disciplinary acts.  Accordingly, the action must be dismissed with prejudice against all defendants.

Therefore, it is

ORDERED that

1.  Defendants' motions for summary judgment are GRANTED; and

2.  Plaintiff's three complaints in the consolidated action are DISMISSED WITH PREJUDICE.

The Clerk of Court is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  October 4, 2019
        Utica, New York.